STATE OF NORTH CAROLINA v. JAMES COURTNEY McDOWELL

No. 417A88

(Filed 14 August 1991)

1. **Constitutional Law § 42 (NCI3d)— capital trial—single counsel privately retained—additional counsel not appointed—no error**

    The trial court did not err by not appointing additional counsel pursuant to N.C.G.S. § 7A-450(b1) in a first degree murder trial where the court had found that defendant was indigent and appointed counsel, defendant's family retained an attorney, the court allowed the appointed counsel to withdraw, defendant explicitly accepted the retained attorney as the counsel of his own choosing, and the retained attorney represented defendant alone from that point. Defendant was not indigent within the meaning of N.C.G.S. § 7A-450(a) from that point and was not entitled to the appointment of assistant counsel.

    **Am Jur 2d, Criminal Law §§ 976 et seq.**

    **Determination of indigency of accused entitling him to appointment of counsel. 51 ALR3d 1108.**

2. **Criminal Law § 175 (NCI4th)— murder—insanity—notice withdrawn—inquiry sufficient**

    The trial court in a murder prosecution conducted a sufficient inquiry of both defendant and his lawyer, prior to jury selection and after the close of defendant's evidence, to determine that the decision to withdraw the notice of defendant's intention to present an insanity defense was knowingly concurred in by defendant.

    **Am Jur 2d, Criminal Law §§ 65 et seq.**

3. **Searches and Seizures § 14 (NCI4th)— search of apartment—consent by roommate—voluntary and intelligent**

    The trial court did not err in a first degree murder prosecution by denying defendant's motion to suppress a search of his apartment and a shell casing seized from the apartment where no one was home when police arrived at defendant's apartment with the arrest warrant for defendant; the officers identified themselves when Karen Curtis arrived at the apartment, told her that they had a warrant for defendant's arrest,

STATE v. McDOWELL

[329 N.C. 363 (1991)]

and requested permission to search the apartment, but stated that she had the right to refuse; Curtis signed and dated the permission form and said she understood it after a detective read it to her; Curtis told the officers that defendant had the key but that a window was raised and they could take the screen off the window; the shell casing was found in the bedroom after officers gained entry; the apartment was listed in Curtis' name and she lived there and paid the rent and utilities from her welfare check; defendant was listed on the utilities form as her roommate; there was only one bedroom and only one closet, in which their clothes were commingled; and there was evidence that Curtis was mentally retarded and did not have the will to disagree with someone in authority. The evidence supported the findings, which supported the conclusions, that Curtis freely, knowingly, intelligently, willingly, and voluntarily gave consent to the search of the apartment; that she was not just submitting to authority; and that the officers acted in good faith without any knowledge of any mental limitations Curtis might have.

**Am Jur 2d, Search and Seizure § 100.**

4. **Jury § 7.12 (NCI3d)— murder—jury selection—opposition to death penalty**

The trial court did not err during voir dire in a murder prosecution by excusing a juror for cause based on his stated opposition to the death penalty where the juror's answers clearly show that he could not follow the law or the instructions of the trial court if to do so would result in a death sentence.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note—Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

5. **Jury § 7.9 (NCI3d)— murder—jury selection—opinion expressed—dismissal proper**

The trial court did not err in a first degree murder prosecution by excusing a juror for cause where the juror stated that he had read about the killing soon after it happened and again on the day before jury selection, and he denied having formed an opinion but stated that the way in which

the defense was planning to operate struck him as unusual. The juror thus expressed an opinion that was possibly prejudicial to defendant and the trial court's action in excusing the juror did not amount to an abuse of discretion.

Am Jur 2d, Jury § 303.

6. **Jury § 6 (NCI3d) — murder — jury selection — independent judgment of counsel**

The trial court did not err in a first degree murder prosecution by allowing defendant input into the voir dire decision making process. Although defense counsel took defendant's feelings into consideration, he did not abdicate his role as effective counsel and defendant was not denied effective assistance of counsel.

Am Jur 2d, Criminal Law §§ 984 et seq.; Jury §§ 195 et seq.

7. **Constitutional Law § 308 (NCI4th) — murder — insanity defense — decision not to present — defendant's input**

There was no error in a first degree murder prosecution where defense counsel gave notice on the first day of trial that he intended to introduce expert testimony on whether defendant had the requisite mens rea for the crime, but did not present such evidence and requested that the court inquire into and put on the record defendant's desires. That inquiry did not reveal that the attorney was forgoing his responsibility in determining whether to present psychiatric evidence but only that there was agreement between defendant and his attorney.

Am Jur 2d, Attorneys at Law §§ 147, 149-151.

8. **Criminal Law § 89.3 (NCI3d) — prior statement of witness — additional material — admissible**

The trial court did not err in a first degree murder prosecution by allowing a witness's prior statement to be read to the jury where that statement contained additional material not testified to by the witness at trial. The statement did not contradict the trial testimony and was consistent with and strengthened the events testified to at trial.

Am Jur 2d, Witnesses §§ 641 et seq.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

9. **Constitutional Law § 309 (NCI4th) — murder — attorney's concession of guilt — not ineffective assistance of counsel**

Defendant in a first degree murder prosecution was not denied the effective assistance of counsel when counsel made concessions regarding guilt where the trial court informed defendant of the need for his authorization and was told on the record that counsel and defendant had discussed the arguments; the trial court gave defendant instructions on an unobtrusive way to stop any argument which went beyond the scope of defendant's grant of authority; defendant expressly stated after the argument that the attorney had said what he had wished him to say; and the attempt by defense counsel to admit matters demonstrably proved but to negate the one charge that would be the foundation for the aggravating circumstance during the sentencing phase was reasonable trial strategy.

**Am Jur 2d, Criminal Law §§ 984 et seq.**

**When is attorney's representation of criminal defendant so deficient as to constitute denial of federal constitutional right to effective assistance of counsel — Supreme Court cases. 83 L. Ed. 2d 112.**

10. **Homicide § 25.2 (NCI3d) — murder — instructions — premeditation and deliberation**

The trial court did not err in its instructions to the jury on premeditation and deliberation during a murder prosecution where the court listed the evidentiary factors from which the jury could infer premeditation and deliberation to include lack of provocation, infliction of lethal wounds after the victim was made helpless, and grossly excessive force, and there was sufficient evidence to support submitting each of those factors.

**Am Jur 2d, Homicide § 501.**

**Modern status of the rules requiring "aforethought," "deliberation," or "premeditation" as elements of murder in the first degree. 18 ALR4th 961.**

11. **Robbery § 4.7 (NCI3d) — attempted armed robbery — evidence insufficient**

The trial court erred by denying defendant's motion to dismiss a charge of attempted armed robbery due to insuffi-

STATE v. McDOWELL

[329 N.C. 363 (1991)]

cient evidence where the evidence supported only the theory that defendant was attempting to prove his manhood but was insufficient to support a reasonable inference of defendant's guilt of armed robbery.

**Am Jur 2d, Criminal Law §§ 512, 513, 517; Robbery §§ 62-67, 85-89; Trial § 436.**

12. **Criminal Law § 1339 (NCI4th)— murder — sentencing — aggravating factor — attempted armed robbery**

A sentence of death for a first degree murder was vacated where the sole aggravating factor submitted to the jury was that the murder was committed while defendant was engaged in an attempt to commit armed robbery and there was insufficient evidence to support defendant's conviction for attempted armed robbery.

**Am Jur 2d, Criminal Law §§ 609, 628.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like — post-Gregg cases. 67 ALR4th 755.**

Justice WHICHARD did not participate in the consideration or decision of this case.

Justice MITCHELL concurring in part and dissenting in part.

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Brannon, J., at the 8 August 1988 Criminal Session of Superior Court, DURHAM County. Defendant's motion to bypass the Court of Appeals as to his convictions of discharging a firearm into occupied property and attempted robbery with a dangerous weapon was allowed by this Court on 5 January 1990. Heard in the Supreme Court 10 April 1991.

*Lacy H. Thornburg, Attorney General, by Joan Herre Byers, Special Deputy Attorney General,* for the State.

*Malcolm Ray Hunter, Jr., Appellate Defender, and Mark D. Montgomery, Assistant Appellate Defender,* for defendant-appellant.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

MEYER, Justice.

Defendant was indicted for the murder of Mrs. Doris Gillie and was tried capitally at the 8 August 1988 Criminal Session of Superior Court, Durham County. The jury found defendant guilty of first-degree murder on the theories of premeditation and deliberation and of felony murder, guilty of discharging a firearm into occupied property, and guilty of attempted robbery with a dangerous weapon. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death for the murder conviction. On 25 August 1988, the trial court sentenced defendant to death in accordance with the jury's recommendation for the murder. Defendant was also sentenced to consecutive terms of ten years for discharging a firearm into occupied property and forty years for attempted robbery with a dangerous weapon.

Defendant brings forward numerous assignments of error relating to both phases of his trial. After a careful consideration of these assignments, as well as the transcript, record, briefs, and oral argument, we find no error in the guilt determination phase of defendant's capital trial; however, we find that the trial court erred in denying defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon, and we therefore vacate the judgment as to this conviction. As this is the basis for the only aggravating circumstance found by the jury in the capital sentencing phase, we must also vacate the sentence of death and impose a life sentence.

The evidence presented by the State tended to show that in the late afternoon of Wednesday, 19 August 1987, two teenagers, Eric Jeffrey and Lee Percell, met with defendant, who had just moved into the neighborhood with his pregnant girlfriend, Karen Curtis. Percell, Jeffrey, and defendant talked for a while and then decided to go to the store to buy some beer or wine. Defendant first went to his house to get some change, and then the men started to walk to the store. After making their purchases, the three men stopped at several houses on the way back, including the Parker residence. There, Jeffrey testified, two people were fighting with each other on the porch. Defendant went onto the porch to see what was going on and recognized one of the occupants, Patricia Parker, from school. He started "coming on strong" to her. Defendant then showed her and her brother a large pistol

which he was carrying in a gym bag. He put the gun away and left with Percell and Jeffrey.

The men then continued on to the "Greenhouse," a group home, to talk to some of the residents. Defendant pulled up his shirt and revealed a pistol in his waistband. After questioning, defendant told one of the residents, Erica Joyner, that the gun was real. Ms. Joyner took the gun and handed it to Percell. Ms. Joyner testified that Percell said the pistol was his and that Percell put the pistol in his pants before they left. After the weapon had been shown to the young women, they went back inside the house. Jeffrey and Percell walked off, and defendant caught up with them. While walking, according to Jeffrey, defendant asked Jeffrey and Percell if they were "down to make money."[1] When Jeffrey replied no, defendant called him a "pussy" and a "chicken." Jeffrey said he could be that. Percell started laughing; as defendant waved the pistol in Jeffrey's face, defendant demanded to know why Percell was laughing. Defendant then left the two and walked toward the Durham Gospel Center. Jeffrey testified that, about five minutes after defendant left them, they heard the sound of shots.

After the Wednesday night prayer service at the Gospel Center, Mrs. Doris Gillie had sent her two children home with some friends. Mrs. Gillie stayed later to talk to some friends and went to the parking lot at about 8:45 p.m. on 19 August 1987. Another attendee, Eddie Sarvis, went to the parking lot at the same time. As he left the parking lot, Mr. Sarvis saw Mrs. Gillie's headlights behind him. He heard a shot just as he pulled out of the lot. He thought Mrs. Gillie's car had misfired and continued to leave. As he turned the corner, he heard three more quick shots, and then he backed up. He saw two persons running down the street. Mr. Sarvis went back toward the church and saw Mrs. Gillie's car still in the lot. He drove into the lot and then saw that Mrs. Gillie's window was shattered. He sent his sister, who was with him, for help.

Mr. Sarvis attempted to assist Mrs. Gillie, who was wounded but still in the car with her seat belt on. The car was in park with the doors locked. Mr. Sarvis reached through the shattered window, opened the door, and attempted to remove Mrs. Gillie,

---

1. In a pretrial written statement to his lawyer which was admitted into evidence but limited to corroboration, Jeffrey said further that defendant had also stated, "He was going to get him some money even if he had to burn somebody."

who was trying to talk, from the vehicle. Before being removed from the vehicle, Mrs. Gillie lapsed into unconsciousness. Mr. Sarvis attempted CPR until the ambulance arrived. Without regaining consciousness, Mrs. Gillie died shortly after arriving at the hospital as the result of two gunshot wounds. The forensic pathologist recovered a .38-caliber slug from her body during the autopsy. He noticed no powder burns on her clothes.

Meanwhile, Jeffrey and Percell had gone back to Percell's home and were sitting on the front porch when defendant came up. Defendant told them he had shot someone and "had to kill them." Later that evening, defendant ran into them again and told them not to tell anyone what he had done.

Crime scene investigators found several bullet holes in the interior of the vehicle consistent with the shots being fired into the vehicle through the driver's window and in a downward angle. Skid marks and broken glass suggested that Mrs. Gillie had moved the vehicle in an attempt to escape. Her pocketbook was found unopened on the front passenger seat. Her body was between the purse and the shattered driver's window.

Later, the police, with the consent of Karen Curtis, searched the home she shared with defendant. The police found a shell casing in a closet. Additionally, the police obtained a .38-caliber pistol in a "mock takedown."[2] The ballistics expert opined that the slug recovered from Mrs. Gillie's body, as well as the shell casing, had been shot from the recovered .38-caliber pistol. However, the expert could not say the cartridge casing was from the Gillie murder.

On 20 August 1987, defendant was arrested and gave a statement denying involvement in the killing. After learning from the police that Erica Joyner had told them about his waving the pistol around, he admitted that he had shot the gun at the urging of Percell and Jeffrey but claimed that he did not mean to shoot Mrs. Gillie. The State was allowed to offer, over objection, a statement that defendant made thereafter: "You see, I'm going to get a psychiatrist. I'm going to beat you. You see, I've told you what

---

2. Detective Smith testified that the pistol had been in the possession of Lee Percell. In the "mock takedown" procedure, the police enlisted the aid of an acquaintance of Percell, who borrowed the pistol under some pretense. The detective pretended to arrest this man, and then seized the pistol after pretending to search his vehicle.

you want to hear but with a psychiatrist, I'll beat you. Now, take me to jail."

While incarcerated in Durham County jail, a fellow detainee, Richard Bradshaw, overheard defendant and another inmate talking. The inmate asked defendant if he had shot the woman he was charged with killing. Defendant replied that "he had burned her and that . . . if it hadn't been for some bitch seeing him earlier that day, he wouldn't be in jail, seen him with the gun." Defendant also stated that the police would not be able to locate the gun.

Defendant presented evidence through Lee Percell and his attorney to show that while defendant, in fact, announced his intent to "burn" someone, he did not mention robbery. Percell's attorney testified that Percell had consistently said that defendant had stated that he was going to "burn somebody" but that defendant had said nothing about robbery. No psychological or psychiatric evidence was presented at the guilt phase of the trial.

At the sentencing phase, the State relied on its guilt phase evidence to prove the aggravating factor of attempted robbery with a dangerous weapon. Defendant's evidence focused on his mental condition. Defendant presented mitigating evidence through his father; Brad Fisher, a clinical psychologist; and William Hussey, a former counselor at a rehabilitation program that defendant had attended.

PRETRIAL ISSUES

I.

[1] Defendant contends that the trial court erred in allowing the capital case against him to proceed without the appointment of additional counsel to assist him and that this violated the mandate of N.C.G.S. § 7A-450(b1). We disagree. On 21 August 1987, defendant appeared in District Court, Durham County, where the court found that defendant was indigent and "not financially able to provide the necessary expenses of legal representation." The court appointed one attorney, E.C. Harris, to represent defendant. Later, attorney Harris moved to withdraw as counsel for defendant on the grounds that attorney Tim Oates had been retained by defendant's family to represent defendant. On 5 October 1987, the court allowed Harris' motion to withdraw. From that time forward, attorney Oates alone represented defendant.

**STATE v. McDOWELL**

[329 N.C. 363 (1991)]

On 22 March 1988, defendant appeared in court, represented by Mr. Oates, as the case was calendared for trial in Superior Court, Durham County. During this proceeding, the district attorney raised the issue of defendant's representation, and the following exchange occurred:

[STATE]: I want to address one other situation. Mr. Oates has made an appearance as counsel of record and during the course of the preliminary proceedings in this matter there was a questions [sic] as to who would be representing Mr. McDowell. He, my impressions is [sic], has been retained by Mr. McDowell's family to represent Mr. McDowell.

MR. OATES: That's correct.

[STATE]: Since this is a capital case, quite honestly, I want the record to reflect that . . . he is Mr. McDowell's choice and because [General Statutes chapter] 7A, as the Court knows, allows proceedings for indigents in which there is also additional counsel situation available, I would like for the record to reflect before we get too far along what the status is and where we are.

COURT: Let me ask the defendant, Mr. McDowell. Mr. McDowell, *is Mr. Oates seated with you at the table your attorney in the trial of this case?*

MR. McDOWELL: *Yes, sir.*

COURT: Are you satisfied with him? The State's attorney indicated that your family retained Mr. Oates and *you consider him retained for you and you accept him as your lawyer?*

McDOWELL: *Yes, I do.*

COURT: Thank you.

[STATE]: Your Honor, I think he probably is otherwise indigent because of his situation and I take it by this that he is waiving any additional counsel because of his indigent status and Mr. Oates is his counsel of record.

[COURT]: Do you understand, Mr. McDowell, and I will ask you the same question. You may be indigent and cannot afford a lawyer yourself. *Mr. Oates is your attorney and he is retained by your family to represent you[,] that you waive any other rights that you may have to an additional court*

STATE v. McDOWELL

[329 N.C. 363 (1991)]

*appointed lawyer and you accept Mr. Oates as your attorney, is. that correct?*

MR. McDOWELL: *Yes, sir.*

(Emphasis added.)

On appeal, defendant assigns as error the failure to appoint additional counsel on his behalf in a timely manner. N.C.G.S. § 7A-450(b1) specifically provides that "[a]n *indigent* person indicted for murder may not be tried where the State is seeking the death penalty without an assistant counsel being appointed in a timely manner." (Emphasis added.) This Court has noted that this section was passed due to a "special concern for the adequacy of legal services received by indicted indigents." *State v. Hucks*, 323 N.C. 574, 577, 374 S.E.2d 240, 242 (1988). The right to the appointment of additional counsel for indigent defendants in capital cases is statutory, not constitutional. *State v. Locklear*, 322 N.C. 349, 368 S.E.2d 377 (1988). An indigent person for whom the State must provide counsel is defined as one "who is financially *unable to secure legal representation* and to provide all other necessary expenses of representation." N.C.G.S. § 7A-450(a) (1989) (emphasis added). The trial court makes the final determination of indigency, and this may be determined or redetermined by the court at any stage of the proceeding at which an indigent is entitled to representation. N.C.G.S. § 7A-450(c) (1989).

Here, defendant was found indigent by the trial court on 21 August 1987 and was subsequently represented by court-appointed counsel E.C. Harris. However, by the 22 March 1988 proceeding, defendant had obtained private counsel, attorney Oates, retained by members of his family, and E.C. Harris had been allowed to withdraw as court-appointed counsel. During the pretrial proceeding, defendant explicitly accepted attorney Oates as his counsel of his own choosing. We hold that from this point on in the pretrial proceeding, defendant was not an indigent within the meaning of N.C.G.S. § 7A-450(a), as he had, through his family, secured private representation and therefore was not entitled to the appointment of assistant counsel.

II.

[2] Defendant contends that the trial court erred in not conducting an inquiry to determine whether defendant had voluntarily and intelligently withdrawn his notice of intent to present an insanity

defense. We disagree. On the first day of trial, defense counsel, pursuant to N.C.G.S. § 15A-959, filed a notice of intention to present an insanity defense. Shortly before jury selection, defense counsel informed the court that he had decided not to rely on the insanity defense, and the following discussion took place:

> [COURT:] . . . I need to tell the jury if [insanity] is to be presented as an affirmative defense, and I wanted to talk to your client about it up one side and down the other.
>
> [DEFENSE COUNSEL]: We have. We have, Judge.
>
> COURT: The defendant is nodding his head, yes.
>
> [DEFENSE COUNSEL]: Judge, I have talked to his parents. I have talked with his psychiatrist in the past, psychologists. I have talked with experts in the Willie M field, and at this time I am informing [the district attorney], Judge, that we are not at this stage of the proceedings, the trial itself, [going to] put in an insanity defense.
>
> COURT: If not now, when?
>
> [DEFENSE COUNSEL]: Well, your Honor, if he's convicted not as an insanity defense, but obviously it is a mitigating factor, but there are a lot of things that will show up at that time if it comes to that stage, Judge.
>
> COURT: Okay.
>
> [DISTRICT ATTORNEY]: It is my impression that he is withdrawing the notice that was filed.
>
> COURT: Insanity, of course, is an absolute defense. If the jury finds insanity, they find the person not guilty by reason of insanity.
>
> [DEFENSE COUNSEL]: But Mr. McDowell, his parents, like I said, and the people that I have talked with, I do not feel that we could convince the jury of that, Judge.
>
> COURT: And, of course, the burden of proof is on the defendant, not beyond a reasonable doubt, but simply to the satisfaction of the jury, but, nevertheless, it is a major strategic decision.
>
> [DEFENSE COUNSEL]: And a very difficult decision in this case, Judge.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

COURT: I know, but you have talked it over with your client in detail and with his family?

[DEFENSE COUNSEL]: Yes, sir.

COURT: *And he has made the decision. He does not want to present that affirmative defense.*

[DEFENSE COUNSEL]: *Is that correct?* (Asks [defendant])

[DEFENDANT]: *Yes, sir.*

[DEFENSE COUNSEL]: He says, yes, your Honor.

(Emphasis added.) Additionally, after the presentation of all evidence, but before the defense rested, the court, out of the presence of the jury, again made inquiry of defendant to make certain that defendant continued to agree to his pretrial decision not to present further evidence of various psychiatric witnesses, and he said he did.

A claim of insanity is an affirmative defense to a crime and does not require a formal inquiry as set forth in N.C.G.S. § 15A-1022, even when a defendant decides to waive his right to plead not guilty. *State v. Avery*, 315 N.C. 1, 337 S.E.2d 786 (1985). We find that the record reflects sufficient inquiry by the trial court, both prior to jury selection and after the close of defendant's evidence, of both defendant and his lawyer, to determine that the decision to withdraw the notice of his intention to present an insanity defense was knowingly concurred in by defendant.

## III.

[3] Defendant further contends that the trial court erred in denying defendant's motion to suppress the search of his apartment and improperly admitted into evidence the shell casing seized from the apartment which he shared with Karen Curtis. We disagree.

N.C.G.S. § 15A-222(3) provides that the consent needed to justify a search and seizure may be given "[b]y a person who by ownership or otherwise is reasonably apparently entitled to give or withhold consent to a search of [the] premises." *State v. Moore*, 316 N.C. 328, 333-34, 341 S.E.2d 733, 737 (1986). The record reflects that the apartment was listed in Karen Curtis' name. She lived there and paid the rent and utilities from her welfare check. Defendant was listed on the utilities form as her roommate. There was only one bedroom, which she shared with defendant, and only one closet, in which their clothes were commingled. Defense counsel conceded

during *voir dire* that Curtis "had an equal right in that apartment," but he asserts that the search was not based upon lawful consent because Curtis did not have sufficient mental ability to voluntarily consent to the search. We find that Curtis possessed common authority with defendant over the searched premises.

When the validity of a consent to search is questioned, the trial court must conduct a *voir dire* hearing to determine if the consent was voluntarily given. *State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685 (1983). "Consent" is defined as "a statement to the officer, made voluntarily and in accordance with requirements of G.S. 15A-222, giving the officer permission to make a search." N.C.G.S. § 15A-221(b) (1988). In determining whether a consent to search is "voluntary" or a product of duress or coercion, express or implied, the trial court looks to the totality of the circumstances. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982).

Here, the trial court conducted an extensive *voir dire* and heard testimony concerning the events surrounding the signing of the consent form. The trial judge found as facts the following: When the police arrived at the apartment with the arrest warrant for defendant, no one was home. When Karen Curtis arrived at the apartment, the officers identified themselves, told her they had a warrant for defendant's arrest, and requested permission to search the apartment but stated that she had the right to refuse. After Detective Smith read Curtis the form for permission to search without a search warrant, she signed and dated it and said she understood it. Curtis told the officers that defendant had the key but that a window was raised and they could take the screen off the window. After gaining entry into the house, the officers and Curtis went into the bedroom, where the shell casing was found in the closet. Curtis then made a written statement to Detective Smith which included the prior day's activities and that she fully and freely and with complete understanding consented to the search.

The trial court also found that Curtis, a twenty-two-year-old woman who is mentally retarded, dropped out of high school in the twelfth grade but can write her own name and can read to some extent. The court further found that she continues to have legal custody of her child and has never been declared legally incompetent.

Defendant presented testimony during the *voir dire* hearing from Mary Ann Rowe, Curtis' social worker, which tended to show that Curtis is mentally retarded. Rowe stated that Curtis may have been able to understand if an officer told her that she had a right to not let him in the apartment, but that she "responds favorably to any authority" and that she does not have the will to disagree with someone in authority. Rowe also stated that Curtis is very "exploitable by others, and needs protection."

This Court has held that a person's subnormal mental capacity is but *one factor* to be considered in determining whether a knowing and intelligent waiver of rights has been made. *See State v. Fincher*, 309 N.C. 1, 305 S.E.2d 685. Despite the testimony cited by defendant as indicative of Curtis' limited mental abilities, there is sufficient evidence in the record that she understood the nature and consequences of her action in signing the form and that she voluntarily consented.

The trial court concluded that Karen Curtis freely, knowingly, intelligently, willingly, and voluntarily gave consent to the search of the apartment; that she was not just submitting to authority; and that the officers acted in good faith without any knowledge of any possible mental limitations that Karen Curtis might have. We find that the trial court's findings of facts are supported by *voir dire* testimony and that these findings fully support the legal conclusion that Karen Curtis' consent to the search was voluntarily and intelligently given, free from any duress or coercion. We hold that the trial court correctly ruled that the spent shell casing seized pursuant to the search was admissible.

·JURY SELECTION ISSUES

IV.

[4] Defendant next contends that the trial court erred in excusing juror Lennie for cause based on his stated opposition to the death penalty. During the trial court's initial statements to three jurors during *voir dire*, juror Lennie interjected the following:

> I read something in the newspaper relating to the facts of this case that seemed to indicate . . . that I might not be acceptable [sic]. I don't believe in either an individual's or a society's rights to kill someone in the death penalty.

Thereafter, the court specifically directed the following question to the jurors:

> Is there anything about capital punishment which is one of the two that the jury is to consider in phase two, the death penalty, that is such that any of you feel that you could perhaps not give both sides the same fair trial and fair consideration on that issue?

Juror Lennie raised his hand. The court asked the juror his thoughts on this issue. Juror Lennie responded:

> Well, sir, as far back as I can remember I have not believed in the death penalty. I just think that is something that should not be imposed upon another person.

The trial court then directed the following questions to juror Lennie:

> COURT: And, Mr. Lennie, how about you, sir? Do you believe that you could simply automatically vote against the imposition of the death penalty without regard to the evidence that might be developed at the trial itself?
>
> MR. LENNIE: *I can't conceive of a circumstance where I would vote for the death penalty.*
>
> . . . .
>
> [COURT:] So I take it that as far as you're concerned that you feel that you would automatically vote for the imposition of the death penalty without any regard to any evidence that might be developed at this trial?
>
> MR. LENNIE: Yes, sir.

(Emphasis added.) While the answer to the last question by the court, containing an obvious *lapsus linguae*, implies that juror Lennie would automatically vote *for* the death penalty, when read with the previous questions, it is obviously understood that juror Lennie would be *un*able to vote *for* the death penalty. Without objection, juror Lennie was excused. Defendant argues that there was an insufficient showing that juror Lennie could not follow the law of North Carolina regarding the death penalty.

In *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985), the United States Supreme Court held that a prospective juror may be removed for cause due to his views about the death penalty if those views would " 'prevent or substantially impair the perform-

**STATE v. McDOWELL**

[329 N.C. 363 (1991)]

ance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 83 L. Ed. 2d at 851 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1989) ); *see also State v. Price*, 326 N.C. 56, 388 S.E.2d 84, *vacated on other grounds*, --- U.S. ---, 112 L. Ed. 2d 7 (1990).

In the case *sub judice*, juror Lennie explicitly stated that he could not conceive of a circumstance in which he would vote for the death penalty. We find that juror Lennie's answers clearly show that he could not follow the law or instructions of the trial court if to do so would result in a death sentence. We hold that the trial court did not err in excusing juror Lennie for cause.

## V.

[5] Defendant contends that the trial court erred in excusing prospective juror Smith *ex mero motu* without any showing that juror Smith was not qualified. During *voir dire*, the trial court asked prospective juror Smith some preliminary questions concerning his knowledge of the case. *See* N.C.G.S. § 15A-1214(b) (1988). Juror Smith stated that he had read about the killing soon after it happened, and again on the day before jury selection. When asked by the trial judge whether he had formed an opinion as to the guilt or innocence of the defendant, juror Smith denied having formed an opinion but stated: "The one thing that strikes me was about the way the defense was planning to operate struck me as unusual, that there was some change. I read that part and that just struck me as unusual, but as to guilt or innocence, no. That was my feeling. It was just unusual." After his statement, juror Smith stated he could put out of his mind what he had read about the case. The trial court excused juror Smith after the questioning without objection from either party.

Because the trial judge has the opportunity to see and hear a juror and closely observe his demeanor on *voir dire* and to make findings based on the juror's credibility and demeanor, he has discretion to ultimately determine whether the juror could be fair and impartial. *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987). A trial judge may, in the exercise of his own discretion, excuse a juror even without challenge from either party. *State v. Waddell*, 289 N.C. 19, 220 S.E.2d 293 (1975), *vacated in part on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). A trial judge's decision as to a juror's competency to serve is not subject to reversal

absent a showing of abuse of discretion. *State v. King*, 311 N.C. 603, 320 S.E.2d 1 (1984).

Here, juror Smith stated that, from what he read, the way in which the defense was planning to operate struck him as unusual. Thus, juror Smith expressed an opinion that was possibly prejudicial to defendant. We find that the trial court's action in excusing juror Smith did not amount to an abuse of discretion and therefore was not error.

## VI.

[6]   Defendant further contends that the trial court erred in allowing defendant himself to make the decision to pass juror Carr and to strike juror Covington and in not requiring defense counsel to exercise judgment independent of defendant's decision in jury selection. Defendant argues that because he was unprepared to represent himself and the trial court made no inquiry regarding this decision, a new trial is required. We disagree.

Tactical decisions at trial, other than the right to testify and plead, are generally left to attorney discretion. *Brown v. Dixon*, 891 F.2d 490 (4th Cir. 1989), *cert. denied*, ---- U.S. ---, 109 L. Ed. 2d 545 (1990); *State v. Luker*, 65 N.C. App. 644, 649, 310 S.E.2d 63, 66 (1983), *aff'd as to error, reversed as to harmlessness of error*, 311 N.C. 301, 316 S.E.2d 309 (1984) ("[W]hether and how to conduct cross-examinations, what jurors to accept or strike, and what trial motions to make are ultimately the province of the lawyer . . . ."). However, this does not mean that the client has no input into tactical decisions. *See Clanton v. Bair*, 826 F.2d 1354 (4th Cir. 1987) (trial counsel was found to have performed effectively when he gave a seemingly lucid client great deference in deciding whether to have psychiatric evaluation), *cert. denied*, 484 U.S. 1036, 98 L. Ed. 2d 779 (1988). In a case filed today, *State v. El Amin Ahmad Ali*, 329 N.C. 394, 407 S.E.2d 183 (1991), this Court, after a complete analysis of defendant's sixth amendment right to counsel, concluded that where defense counsel allowed defendant to make a decision not to peremptorily challenge a juror, against the recommendations of both his attorneys, the client's wishes must control. Contrary to *El Amin Ahmad Ali*, in the case *sub judice*, the record reveals that counsel and defendant were not in conflict as to whether to pass or strike these jurors, but simply that defense counsel gave deference to his client's wishes.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

In the matter now before the Court, the questions asked of juror Carr revealed that he knew the prosecutor in high school but not well; that he was middle aged, attended church, and worked at Burroughs Wellcome; and that he would consider either life imprisonment or the death penalty, depending on the circumstances of the crime, but that he would have to listen to all of the evidence. After defense counsel passed juror Carr because his client liked him as a prospective juror, the trial court asked defendant the following:

> [COURT:] Your lawyer has advised you that while he has [the] right to simply make that decision[,] he has told me, as I understand it, that he is going to pay great attention and consult with you as to each and every juror, and I've noticed him doing that, and so your wishes will be followed pretty much since this is your trial. Is that pretty much correct?

> MR. McDOWELL: Yes, sir.

Here, defendant acknowledged that his attorney had the right to make the decision regarding jury selection. We find that defense counsel, simply by consulting with defendant regarding potential jurors, did not relinquish his authority as "attorney" but merely gave deference to his client's wishes in making his tactical decision to pass juror Carr.

Defendant also complains that defense counsel simply excused another juror, Covington, without questioning her. Defense counsel stated that he was excusing the juror because defendant's family had some reservations about this juror. Defense counsel further remarked that defendant was "emphatic" about excusing juror Covington, although it would be defendant's last peremptory challenge. The decision not to question juror Covington does not show a failure to act as counsel, as the State had already extensively questioned the juror. The questions posed by the State were sufficient to give defense counsel enough information to make an informed decision. We find that defense counsel acted within the range of competent counsel in excusing the juror without questioning her.

In both instances, defendant has failed to show that defense counsel was ineffective in giving deference to defendant's wishes during jury selection. Although defense counsel took defendant's feelings into consideration, he did not abdicate his role as effective

counsel. We find that the trial court did not err in permitting defendant to give input into the *voir dire* decision-making process and that defendant was not denied effective assistance of counsel. *Cf. State v. El Amin Ahmad Ali*, 329 N.C. 394, 407 S.E.2d 183 (defendant not denied effective assistance of counsel where defendant made a decision to accept a juror, against the recommendations of both his counsel); *State v. Davis*, 101 N.C. App. 12, 398 S.E.2d 645 (1990) (not prejudicial error, if error at all, to allow a criminal defendant to call a witness over the recommendation of his attorney). This assignment of error is without merit.

GUILT PHASE ISSUES

VII.

[7] Defendant contends that the trial court erred in allowing him personally to make the decision whether to present any psychiatric evidence at the guilt phase. We disagree. Defense counsel gave notice on the first day of trial that he intended to introduce expert testimony on whether defendant had the requisite *mens rea* for the crimes. Dr. Brad Fisher, a clinical psychologist, was available to testify for defendant and to present evidence on the issue. After reviewing the expert's testimony presented at the sentencing proceeding, defendant argues that the evidence would have cast doubt during the guilt phase as to whether defendant formed the intent to kill after premeditation and deliberation.

At the close of defendant's evidence at the guilt phase, the question arose as to whether defendant would present any psychiatric "defense." Defense counsel addressed the court:

> Your Honor, *at this time that is the extent of our evidence.* I would like to, at this time, request the court . . . obviously the defendant at this time has a choice to take the stand on his own behalf. And I would like the Court to inquire and put on the record what he's indicated to me his desires are which are not to take the stand *and not to put on any further evidence.*

(Emphasis added.) The trial court then addressed defendant personally:

> COURT: And as to the offering of other evidence besides yourself, your lawyer has talked to you about that?
>
> A: Yes, sir, he has.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

COURT: All right. There has . . . some mention has been made on a pretrial basis according to . . . made aware by your lawyer that you have seen various psychiatrists in connection with possible testimony in this case. And the possibility that they might offer evidence which might be pertinent or relevant on Phase One as well as Phase Two. You're [sic] lawyer has gone over that with you, right?

A: Yes, sir.

COURT: And he's told you the pros and cons of that decision too, is that correct?

A: Yes, sir, he has.

COURT: Has that all been explained in the presence of your parents too?

A: Yes, sir. In the presence of my parents and without my parents. So, I understand what he was talking about.

COURT: And what decisions do you want to make, sir, in regards to calling any other witnesses other than the two that have testified? Do you want any other witnesses to testify here for you in this guilt or innocence phase?

A: Well, I know that there would be a physician that would testify for me. So, he was one but my attorney I don't think he has anybody else.

COURT: I want to make sure you don't misunderstand me.

A: Not in this phase.

COURT: Okay. This phase . . . deals with guilt or innocence.

A: Yes, sir.

COURT: Phase Two if reached deals with life or death. You heard me explain that to all prospective jurors at great length when we had jury selection.

A: Yes, sir, I did.

COURT: And this phase right here deals with guilt or innocence. It's your own choice that your lawyer will not call a psychiatrist or any other witnesses for you in this phase we're in right now.

A: Yes, sir. That is correct.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

It is undisputed that the type of defense to present and the number of witnesses to call is a matter of trial tactics, and the responsibility for these decisions rests ultimately with defense counsel. *See Jones v. Barnes,* 463 U.S. 745, 77 L. Ed. 2d 987 (1983); *Brown v. Dixon,* 891 F.2d 490 (4th Cir.). Prior to the trial court's inquiry of defendant, defense counsel stated, "at this time that is the extent of our evidence." The record indicates that counsel had made the determination not to call any psychiatric witnesses and then requested that the court enter into the record that defendant knew of his right to testify and present further witnesses. We find that this inquiry did not reveal that the attorney was forgoing his responsibility in determining whether to present psychiatric evidence but only that there was agreement between defendant and his attorney.

## VIII.

[8]   Defendant next contends that the trial court erred in allowing a witness' statement to be read to the jury since the statement contained additional material not testified to by the witness at trial. We disagree. In his testimony at trial, the witness, Eric Jeffrey, said defendant asked if Jeffrey and Percell "were down to make money," to which Mr. Jeffrey replied, "No. No." The State asked if defendant had not said something else before walking off. Mr. Jeffrey denied that he did, except to call them "chicken." The State then called Mr. Falcone, Mr. Jeffrey's attorney. The trial court allowed Mr. Falcone to read to the jury a statement that he took from Mr. Jeffrey concerning the killing. In this statement, Mr. Jeffrey had stated that defendant had also "said he was going to get him some money even if he had to burn somebody."

This Court has previously held that prior statements of a witness can be admitted as corroborative evidence if they tend to add weight or credibility to the witness' trial testimony. *State v. Coffey,* 326 N.C. 268, 389 S.E.2d 48 (1990); *State v. Ramey,* 318 N.C. 457, 349 S.E.2d 566 (1986). New information contained within the witness' prior statement, but not referred to in his trial testimony, may also be admitted as corroborative evidence if it tends to add weight or credibility to that testimony. *Id.* However, the State cannot introduce prior statements which "actually directly contradicted . . . sworn testimony." *State v. Burton,* 322 N.C. 447, 451, 368 S.E.2d 630, 632 (1988). The witness' trial testimony that defendant had said nothing else after calling him "chicken," when the pretrial

STATE v. McDOWELL

[329 N.C. 363 (1991)]

statement detailed the additional comment, is not the type of contradiction that would render the pretrial statement inadmissible. *Cf. State v. Howard,* 320 N.C. 718, 360 S.E.2d 790 (1987). We find that witness Jeffrey's statement to his attorney did not contradict his trial testimony and was consistent with and strengthened the events testified to at trial. We hold that the trial court did not err by allowing the statement to be read to the jury by Jeffrey's attorney.

IX.

[9] Defendant contends that he was denied the effective assistance of counsel when his attorney conceded his guilt to the jury. We disagree and find that the inquiry conducted by the trial court and counsel on the record with defendant was sufficiently specific to meet the requirements set forth in *State v. Harbison,* 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied,* 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). When defense counsel was about to make his closing argument at the guilt phase, the trial court addressed defendant:

Now, you have entered a plea of not guilty in this case. Do you understand that?

[DEFENDANT]: Yes, sir.

COURT: Now, under the case law your lawyer cannot argue to this jury anything other than flat not guilty unless you specifically authorize him to say something else. In other words, if it is your secret hope that they convict you of second degree murder and not first degree murder, if it's your secret hope that something else will happen other than flat not guilty, you're going to have to specifically authorize your lawyer to argue that to the jury.

Because unless you specifically authorize it, he can only argue to this jury that they should turn you loose on everything across the board. The case law squarely says that . . . pleading guilty, in other words, without you filling in a transcript of plea, for him to argue anything by way of a lesser included offense to this jury. I don't care what you do, I care less, but it's going to be on the record whatever decision you want to make about your lawyers [sic] argument.

Do you understand all the things I told you?

[DEFENDANT:] Yes, sir.

STATE v. McDOWELL

[329 N.C. 363 (1991)]

[DEFENSE COUNSEL]: I will review it with him again, Judge.

COURT: And what's more, *if, during your lawyers [sic] argument, you find he's exceeding his authority from you, you better raise your hand and I'll stop him and I'll send the jury out so we can make sure the only arguments to the jury is [sic] within the authority you granted.*

The court then informed defense counsel that "unless I hear otherwise from him, unless he raises his hand, I'm going to assume that whatever you say to this jury is what he's authorized you to say."

During his argument, defense counsel admitted that defendant shot Mrs. Gillie. He then conceded that defendant intentionally fired into an occupied vehicle. Defense counsel argued that defendant's statement is that he "shot in the car, didn't realize the woman was there or hit her and [he] kept shooting." He continued to argue that defendant shot the pistol in order to show his "manhood." Defendant now argues that although the lawyer, at one point, argued that the correct punishment should be involuntary manslaughter, he conceded all the elements of first-degree murder on two theories.

After the argument in which certain concessions were made, the court asked defendant:

I need to inquire of the defendant. Did your lawyer argue to the jury what you wanted him to argue?

[DEFENDANT]: Yes, sir, he did.

COURT: Did he say anything to the jury[,] anything you didn't want him to tell or didn't authorize him to [do]?

[DEFENDANT]: No, sir, he didn't.

This Court has held that any concession of a client's guilt absent a consent by defendant to do so constitutes ineffective assistance of counsel *per se. State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (relying on *Earl Wayne Wiley v. Sowders*, 647 F.2d 642 (6th Cir.), *cert. denied*, 454 U.S. 1091, 70 L. Ed. 2d 630 (1981)). In a subsequent opinion in *Elmer Lee Wiley v. Sowders*, 669 F.2d 386 (6th Cir. 1982), the Sixth Circuit Court of Appeals clarified its earlier holding, concluding that "an on-the-record inquiry by the trial court to determine whether a criminal defendant has consented to an admission of guilt during closing arguments represents the preferred practice. But we did not hold in *Wiley*, [647 F.2d

642,] and we do not now hold, that due process requires such a practice." 669 F.2d at 389. This Court has previously declined to set out what constitutes an acceptable consent by a defendant in this context. However, we have remanded a case to the superior court for an evidentiary hearing for the sole purpose of determining whether defendant *knowingly consented* to trial counsel's concessions of defendant's guilt to the jury. *State v. Thomas*, 327 N.C. 630, 397 S.E.2d 79 (1990).

In the case *sub judice*, the trial court informed defendant of the need for his authorization and was told on the record that counsel and defendant had discussed the arguments. The trial court then gave defendant instructions on an unobtrusive way to stop any argument which went beyond the scope of defendant's grant of authority. Finally, after the argument, defendant expressly stated that the attorney had said what he had wished him to say. We find that defendant's consent to his attorney's argument was in compliance with the requirements of *Harbison*.

Where a knowing consent to such an argument has been demonstrated, as in the case at bar, the issue concerning ineffective assistance of counsel should be examined pursuant to the normal ineffectiveness standard set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, *reh'g denied*, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984), and *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). The circumstances of this case indicate that the attempt by defense counsel to admit matters demonstrably proved but to negate the one charge that would be the foundation for the aggravating circumstance during the sentencing phase was reasonable trial strategy. Here, defendant admitted in a voluntary pretrial statement that he fired the shots which killed Mrs. Gillie. Defendant stated he did not intend to hurt anyone, but the "accident" claim in his admission was contradicted by the evidence. To negate the attempted armed robbery charge, defense counsel was forced to call a witness who stated defendant intended to "burn" someone to prove his manhood but had said nothing about robbery. Given these facts, it is arguable that defense counsel made a strategically reasonable argument.

Defense counsel admitted that "we came in this courtroom and pled not guilty as a procedural matter" and went on to state "[w]e've not tried to deceive you or play the shell game with you or try to say someone else did it." Counsel admitted that defend-

ant's "evidence shows you that, in fact, [defendant] did, in fact, go to the back of the Gospel Center . . . and shot Doris Gillie." He also stated, "I'm not going to stand up here and argue . . . [that] you can't find from the facts presented in this court, [that] you shouldn't find[,] that [defendant] shot into that occupied vehicle." He noted that, if defendant's statement were believed, "he's guilty of manslaughter." Defense counsel noted other evidence and said, *if believed*, "then I guess you can find first degree murder." We find that the argument was a reasonable tactical decision by defense counsel and hold that defense counsel was not ineffective when he, with defendant's consent, conceded defendant's guilt to particular aspects of the crimes.

## X.

**[10]** Defendant contends that the trial court erred in its instructions to the jury on premeditation and deliberation because the instruction allowed the jury to convict defendant on theories not supported by the evidence. We disagree. The court listed the evidentiary factors from which the jury could infer premeditation and deliberation to include lack of provocation, infliction of lethal wounds after the victim was made helpless, and grossly excessive force.

Each factor upon which the jury is instructed as circumstantial proof of premeditation and deliberation must be supported by competent evidence. *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). However, this Court has held that the appropriate standard for review for unobjected-to instructions, as in the case at bar, is plain error. *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983). We find that, when viewed in the light most favorable to the State, there is sufficient evidence to support submitting each of these factors.

First, as to the evidence on the lack of provocation, the record does not reflect any showing whatsoever of provocation by Mrs. Gillie. Defendant's admission concerning shooting this stranger did not suggest that she was in any way argumentative or confrontational. *See State v. Jackson*, 317 N.C. 1, 343 S.E.2d 814 (1986), *vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). Second, the evidence showing that one shot, then a series of three shots, fired into a vehicle while Mrs. Gillie sat, strapped into the driver's seat, is sufficient to show the infliction of lethal blows after the victim was killed or rendered helpless. *State v. Barbour*, 295 N.C. 66, 243 S.E.2d 380 (1978). Finally, the evidence is con-

sistent with excessive brutality in firing a disabling shot into the victim and then, as she slumped defenseless, shooting at her three more times, striking her at least once. *State v. Forrest*, 321 N.C. 186, 362 S.E.2d 252 (1987). We hold that the trial court correctly instructed on premeditation and deliberation.

## XI.

[11] Defendant contends that the trial court erred in denying his motion to dismiss the charge of attempted armed robbery due to the insufficiency of the evidence. We agree and therefore vacate the conviction of attempted robbery with a dangerous weapon.

The motion to dismiss must be allowed unless there is substantial evidence of each element of the crime charged. *State v. Brown*, 310 N.C. 563, 313 S.E.2d 585 (1984). Attempted armed robbery is the unlawful attempted taking of personal property from another by use of a firearm or other dangerous weapon. *See State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980). "Substantial evidence is evidence from which any rational trier of fact could find the fact to be proved beyond a reasonable doubt." *State v. Sumpter*, 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986). The evidence must be viewed in the light most favorable to the State, and the State is entitled to every reasonable inference that is drawn therefrom. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982). However, "[e]vidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong." *State v. Reese*, 319 N.C. 110, 139, 353 S.E.2d 352, 368 (1987).

The State relies upon the testimony of Eric Jeffrey and Lee Percell, both of whom were also charged in connection with these crimes, to support the attempted armed robbery charge. Both of these witnesses testified to defendant's possession of the pistol. However, the evidence of defendant's intent provided by these witnesses is insufficient to support a reasonable inference of attempted armed robbery. In a pretrial written statement to his lawyer which was admitted into evidence for corroborative purposes, Jeffrey said that defendant had stated, "He was going to get him some money even if he had to burn somebody." According to Mr. Jeffrey at trial, defendant only asked him and Percell if they were "down to make money." When Jeffrey replied no, defendant called him a "pussy" and a "chicken." Jeffrey said he could be that. Percell started laughing; as defendant waved the pistol in Jeffrey's face, defendant demanded to know why Percell was

laughing. Jeffrey's testimony about "money" was contradicted by Mr. Percell, who testified that defendant had stated he was going to "burn" somebody but said nothing about robbery. Additionally, Mrs. Gillie's purse was left undisturbed on the front seat of her car, which tends to contradict the State's theory that defendant killed Mrs. Gillie in an unsuccessful attempt to take her purse. Even viewing the evidence in the light most favorable to the State, the evidence only supports the theory that defendant was attempting to prove his manhood but is insufficient to support a reasonable inference of defendant's guilt of armed robbery. We find that the record is insufficient to show more than a suspicion that defendant attempted to rob Mrs. Gillie. We hold that the trial court erred in denying defendant's motion to dismiss the charge of attempted robbery with a dangerous weapon and therefore vacate this conviction.

PENALTY PHASE ISSUE

XII.

[12] Finally, we address defendant's contention that the trial court erred in submitting the aggravating circumstance in the capital sentencing phase that the killing was committed during an attempt to commit a robbery with a dangerous weapon. We agree and must therefore vacate the sentence of death and impose a sentence of life imprisonment.

The sole aggravating circumstance submitted to the jury during the sentencing phase was that the murder "was committed while defendant was engaged in an attempt to commit robbery with a dangerous weapon." Because there was insufficient evidence to support defendant's conviction for attempted armed robbery, we find that there was insufficient evidence to support this aggravating circumstance. The sentence of death shall be vacated and a sentence of life imprisonment imposed in lieu thereof, where, as in the case *sub judice*, the record does not support the jury's findings of any aggravating circumstance upon which the sentencing court based its sentence of death. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Hamlet*, 312 N.C. 162, 321 S.E.2d 837 (1984).

In conclusion, we find no error in defendant's conviction of discharging a firearm into occupied property or in defendant's conviction of first-degree murder. Judgment is vacated in the attempted robbery with a dangerous weapon conviction. Additionally, the

STATE v. McDOWELL

[329 N.C. 363 (1991)]

death sentence is vacated, and defendant is hereby sentenced to imprisonment in the State's prison for the remainder of his natural life. Defendant is entitled to credit for days spent in confinement prior to the date of this judgment. The Clerk of Superior Court, Durham County, shall issue a commitment accordingly.

87CRS20386, discharging a firearm into occupied property: No error;

88CRS18602, attempted robbery with a dangerous weapon: Vacated;

87CRS20381, first-degree murder: Guilt-innocence determination phase: No error; Sentencing phase: Death sentence vacated and sentence of life imprisonment imposed.

Justice WHICHARD did not participate in the consideration or decision of this case.

Justice MITCHELL concurring in part and dissenting in part.

I concur in the majority's conclusions and holdings that the convictions of the defendant for murder in the first degree and for discharging a firearm into occupied property were without error.

I dissent from Part XI of the opinion of the majority, in which it concludes that the trial court erred in denying the defendant's motion to dismiss the charge of attempted armed robbery and from the holding of the majority vacating the defendant's conviction for that offense. I believe that the evidence to support the defendant's conviction for attempted armed robbery was substantial and that the trial court properly denied his motion to dismiss.

Where there is substantial evidence of each element of the offense charged and that the defendant is the perpetrator, the trial court must deny the defendant's motion to dismiss the charge for insufficiency of evidence. *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence

STATE v. McDOWELL

[329 N.C. 363 (1991)]

must be existing and real, not just seeming or imaginary."
*State v. Powell,* 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*Id.,* 405 S.E.2d at 154 (quoting *State v. Vause,* 328 N.C. 231, 236,
400 S.E.2d 57, 61 (1991)).

Evidence was introduced in the present case tending to show
that the defendant confessed to shooting and killing the victim,
Doris Gillie. The majority concludes, however, that there was no
substantial evidence tending to show that the defendant did so
during an attempted armed robbery. I do not agree.

The evidence at trial tended to show that Lee Percell and
Eric Jeffrey were with the defendant shortly before the victim
was killed on the evening of 19 August 1987. The defendant had
been showing his pistol to the residents of a group home, and
Jeffrey and Percell had walked away. The defendant caught up
with them and engaged them in conversation. Jeffrey testified at
trial that the defendant asked him and Percell if they were "down
to make money." When Jeffrey said "no," the defendant called
him "chicken" and otherwise verbally abused him. Percell testified
that during the same conversation, the defendant stated he was
going to "burn" somebody. The evidence further tended to show
that the defendant concluded his conversation with the two men
and walked toward the Durham Gospel Center. About five minutes
later, the two men heard the sound of gunshots.

The evidence also tended to show that the victim, Doris Gillie,
had stayed behind after evening prayer service at the Durham
Gospel Center to talk with other congregants. She left later and
went to her car in the parking lot. Another congregant, Eddie
Sarvis, went to the parking lot at the same time as the victim.
As Sarvis left the parking lot, he saw the victim's headlights behind
him. He heard a shot, which he mistook for the victim's car misfir-
ing, and continued to drive away. He then heard three more shots
in quick succession, however, and immediately returned to the park-
ing lot. He found the victim in the driver's seat of her car fatally
wounded. The doors were locked, and the transmission indicator
revealed that the car was still in the "park" position. Sarvis was
able to reach through the shattered window by the driver's seat
and unlock and open the door. The victim lapsed into unconsciousness
and died shortly after she was taken to a nearby hospital. An
officer who arrived at the scene after the murder found the victim's

STATE v. McDOWELL

[329 N.C. 363 (1991)]

purse on the front seat of her car, but he was able to find it there in the dark only by the use of a flashlight.

I believe that the foregoing evidence would support reasonable inferences by the jury to the effect that, after his statements to Jeffrey and Percell as to whether they wanted to "make" money and that he was going to "burn" someone, the defendant carried through on his stated intent. A jury could reasonably find that he then went directly to the Durham Gospel Center and attempted to rob the first departing congregant he came upon.

The fact that after the murder the victim's purse was found in her car by an officer using a flashlight was some evidence tending to support the view that the defendant did not intend to rob her. However, a "trial court is *not* required to determine that the evidence excluded every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss." *State v. Powell*, 299 N.C. 95, 101, 261 S.E.2d 114, 118 (1980). Substantial evidence tended to support a reasonable finding—not a mere suspicion—that the defendant shot and killed the victim while attempting to satisfy his expressly stated desires to "make" money and to "burn" someone. The evidence also tended to support findings that he fled before completing the robbery he was attempting because he found the driver's side door of the car locked, could not see the purse on the seat, but could see Eddie Sarvis coming to assist the victim. In fact, such findings would seem more reasonable to me than the only reasonable findings to the contrary—that the defendant simply strolled into a church parking lot after evening prayer service, shot and killed one congregant previously unknown to him, and then left the scene.

The foregoing evidence was substantial evidence tending to show that the defendant attempted an armed robbery of the victim; other evidence may have tended to show that he did not. However, "contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. . . ." *Id.* at 99, 261 S.E.2d at 117. Instead, it must be remembered that:

> When the motion . . . calls into question the sufficiency of
> . . . evidence, the question for the Court is whether a reasonable
> inference of defendant's guilt may be drawn from the cir-
> cumstances. If so, it is for the *jury* to decide whether the
> facts, taken singly or in combination, satisfy them beyond a
> reasonable doubt that the defendant is actually guilty.

*Id.,* 261 S.E.2d 117 (emphasis added) (quoting *State v. Rowland,* 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)). Here, there was substantial evidence tending to show that the defendant killed his victim while attempting an armed robbery. Therefore, the trial court was correct in submitting that evidence to the jury to determine what it actually proved or failed to prove—a question of fact exclusively for the jury. The trial court did not err in denying the defendant's motion to dismiss the charge of attempted armed robbery for insufficiency of evidence.

For the foregoing reasons, I also dissent from Part XII of the opinion of the majority, in which the majority concludes that, due to the insufficiency of evidence to support a conviction for attempted armed robbery, the evidence also was insufficient to support the aggravating circumstance that the capital felony was committed while the defendant was engaged in an attempt to commit robbery. N.C.G.S. § 15A-2000(e)(5) (1988). Accordingly, I further dissent from the majority's holding that, since no other aggravating circumstance was submitted to the jury or supported by evidence, the sentence of death against the defendant must be vacated and a sentence of life imprisonment imposed.