IN THE SUPREME COURT OF NORTH CAROLINA

No. 319A19

Filed 18 December 2020

IN THE MATTER OF: A.L.L.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 29 April 2019 by Judge April C. Wood in District Court, Davie County. Heard in the Supreme Court on 2 September 2020.

*Christopher M. Watford for petitioner-appellees.*

*Jeffrey L. Miller, for respondent-appellant mother.*

EARLS, Justice.

Respondent appeals from an order entered by the Davie County District Court terminating her parental rights to her minor daughter, Ann.[1] The trial court determined that grounds existed to terminate respondent's parental rights pursuant to N.C.G.S. §§ 7B-1111(a)(6) and (a)(7). Although we agree with petitioners that the Davie County District Court had subject-matter jurisdiction to enter a termination order, we conclude that petitioners have not proven by clear, cogent, and convincing evidence that grounds existed to terminate respondent's parental rights. Further, we hold that the requirements of N.C.G.S. § 7B-1111(a)(6) are not met in this case

---

[1] We refer to the juvenile by the pseudonym "Ann" for ease of reading and to protect the privacy of the juvenile.

because Ann resides with legal permanent guardians and that the record lacks any evidence supporting a conclusion that respondent acted willfully within the meaning of N.C.G.S. § 7B-1111(a)(7). Accordingly, there is no cause to remand for further fact-finding, and we reverse the trial court's order.

Standard of Review

A trial court with subject-matter jurisdiction "is authorized to order the termination of parental rights based on an adjudication of one or more statutory grounds." *In re J.A.E.W.*, 375 N.C. 112, 117, 846 S.E.2d 268, 271 (2020). Absent subject-matter jurisdiction, a trial court cannot enter a legally valid order infringing upon a parent's constitutional right to the care, custody, and control of his or her child. *In re E.B.*, 375 N.C. 310, 315–16, 847 S.E.2d 666, 671 (2020). Whether or not a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo. *See, e.g., Willowmere Cmty. Ass'n, Inc. v. City of Charlotte*, 370 N.C. 553, 556, 809 S.E.2d 558, 560 (2018). Challenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings, including "for the first time before this Court." *In re T.R.P.*, 360 N.C. 588, 595, 636 S.E.2d 787, 793 (2006).

"At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under [N.C.G.S. § 7B-1111(a)]." *In re J.A.E.W.*, 375 N.C. at 116, 846 S.E.2d at 271 (citation omitted). We review a trial court's order "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the

conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984). The trial court's conclusions of law are reviewed de novo. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

<u>Background</u>

Respondent gave birth to her daughter, Ann, in July 2015. On the day Ann was born, respondent made concerning statements to hospital personnel indicating a lack of understanding of what was required to safely care for a newborn child. After receiving respondent's mental-health treatment records, which indicated that she had previously been diagnosed with schizophrenia, obsessive compulsive disorder, bipolar disorder, and an eating disorder, a doctor from the hospital conducted a mental health assessment and confirmed a primary diagnosis of schizophrenia. A report was made to the Davidson County Department of Social Services (DSS) alleging that respondent's mental health conditions might render her unable to independently care for Ann. Respondent was unable or unwilling to provide information about Ann's father. She was unable to provide DSS with the name of any person that could assist her in caring for Ann or who could serve as an appropriate kinship placement.

Two days later, DSS filed a petition seeking to have Ann adjudicated to be a dependent juvenile. DSS obtained nonsecure custody and placed Ann with foster parents, the petitioners in the present case. Respondent entered into an out-of-home family services agreement, agreeing to participate in parenting classes, complete a

psychological and parenting capacity assessment, complete individual counseling, and maintain suitable housing and visits with Ann. At a hearing on 7 October 2015, the parties stipulated that Ann was a dependent juvenile and the Davidson County District Court entered an order to that effect. Respondent was ordered to make progress towards completing the terms of her case plan. She was allowed supervised visits with Ann twice a week for two hours each time.

The trial court's first permanency-planning order reflects that respondent made significant progress towards satisfying the terms of her case plan. She had completed parenting classes and a psychological and parenting capacity assessment, started attending therapy and counseling, and obtained stable housing. She attended all visitations with Ann except one. However, DSS and others involved in treating respondent's mental health conditions continued to report significant concerns about respondent's capacity to safely care for Ann. Although respondent was receiving counseling and taking medications, she denied that she had a mental illness. She also failed to appropriately interact with her child during visits, persisting in behaviors suggesting inattentiveness to or incomprehension of Ann's needs. She demonstrated an unwillingness to acknowledge and address her deficiencies as a parent, disregarding basic parenting advice offered by DSS. Weighing respondent's progress against her undeniable shortcomings as a parent, the trial court established a permanent plan of reunification and a secondary plan of guardianship.

After the first permanency-planning hearing, respondent continued to struggle to address her severe mental health issues. At times, respondent was combative and disrespectful towards DSS. She repeatedly provided Ann with gifts, clothing, and food that were not age appropriate. Although none of her relatives were able to serve as a kinship placement, a potential guardian who was acquainted with respondent's immediate family was identified and approved as an appropriate alternative caregiver for Ann. However, the trial court changed the permanent plan to guardianship with a secondary plan of termination of parental rights and adoption. Ultimately, the trial court implemented the primary permanent plan by appointing petitioners as Ann's legal permanent guardians pursuant to N.C.G.S. § 7B-600. Respondent was awarded visitation with Ann for one hour every three months supervised by petitioners in a public place of their choosing. The trial court waived future permanency planning and review hearings.

On 27 February 2018, petitioners filed a petition seeking to terminate respondent's parental rights in Davie County District Court. Petitioners stated that they wished to have respondent's parental rights terminated in order to adopt Ann "as soon as possible." Over respondent's objection, the trial court appointed her an attorney and a guardian *ad litem*. At a termination hearing on 15 April 2019, the trial court received evidence from a psychologist who evaluated respondent and the DSS social worker who managed respondent's case. The evidence indicated that while respondent "did everything that DSS and the [c]ourt asked her to do," her mental

health conditions, and resultant deficiencies as a parent, rendered her unable to safely care for her daughter. Testimony presented at the hearing also indicated that respondent had persisted in her refusal to take prescribed medication to treat her mental health conditions, although the DSS social worker acknowledged that even if respondent had complied with her medication plan, she would still lack the "mental health stability" necessary to be a parent.

On 29 April 2019, the Davie County District Court entered an order terminating respondent's parental rights on the grounds that she was incapable of providing for the proper care and supervision of Ann such that Ann was a dependent juvenile, pursuant to N.C.G.S. § 7B-1111(a)(6), and that she had willfully abandoned Ann, pursuant to N.C.G.S. § 7B-1111(a)(7). Respondent appealed the trial court's order.

<u>Analysis</u>

Respondent raises three challenges to the Davie County District Court's order terminating her parental rights to Ann. First, she contends that the Davie County District Court lacked subject-matter jurisdiction to enter an order terminating her parental rights because the Davidson County District Court had previously entered a permanency-planning order establishing petitioners as Ann's legal permanent guardians. Second, respondent argues that the trial court failed to make adequate findings to support a conclusion that she lacked an "appropriate alternative child care arrangement" for Ann as required under N.C.G.S. § 7B-1111(a)(6) and that the

requirements of N.C.G.S. § 7B-1111(a)(6) cannot be satisfied as a ground for terminating the rights of a parent whose child has been placed with legal permanent guardians. Third, respondent argues that the trial court failed to make adequate findings to support a conclusion that she had "willfully abandoned" Ann within the meaning of N.C.G.S. § 7B-1111(a)(7) and that the record lacks any evidence indicating that her behavior was anything other than a manifestation of her severe mental health conditions. We address each argument in turn.

*a. Jurisdiction*

Respondent argues that the Davie County District Court lacked jurisdiction because the Davidson County District Court had previously entered a legally valid order establishing a permanent plan of guardianship in Ann's underlying dependency proceeding. If respondent were correct that the Davie County trial court lacked subject-matter jurisdiction, then its order terminating respondent's parental rights was "[a] void judgment [which] is, in legal effect, no judgment. No rights are acquired or divested by it." *Hart v. Thomasville Motors, Inc.*, 244 N.C. 84, 90, 92 S.E.2d 673, 678 (1956); *see also In re T.R.P.*, 360 N.C. at 590, 636 S.E.2d at 790 ("Subject-matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest, and in its absence a court has no power to act[.]"). However, we conclude that the Davie County District Court had subject-matter jurisdiction to enter an order terminating respondent's parental rights.

A trial court's subject-matter jurisdiction over a petition to terminate parental rights is conferred by N.C.G.S. § 7B-1101.

> The court shall have exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion.

N.C.G.S. § 7B-1101 (2019). Respondent does not dispute that at the time the termination petition was filed, Ann resided with her legal permanent guardians in Davie County. Respondent does not dispute that petitioners were an appropriate party to file a termination petition given that they had "been judicially appointed as the guardian of the person of the juvenile." N.C.G.S § 7B-1103(a)(1) (2019). In an attempt to circumvent the necessary conclusion that the Davie County District Court had subject-matter jurisdiction, respondent contends that permitting one court to override another court's permanency planning order frustrates the Juvenile Code's overarching policy of preserving family autonomy by preventing the unnecessary dissolution of parent-child bonds. *See* N.C.G.S. § 7B-100 (2019). Further, she argues that permitting the Davie County District Court to exercise jurisdiction would be inconsistent with North Carolina's "integrated" juvenile system, which creates "one continuous juvenile case with several interrelated stages, not a series of discrete proceedings." *In re T.R.P.*, 360 N.C. at 593, 636 S.E.2d at 792.

It is well-established that "[a] court's jurisdiction to adjudicate a termination petition does not depend on the existence of an underlying abuse, neglect, and dependency proceeding." *In re E.B.*, 375 N.C. at 317, 847 S.E.2d at 672. Indeed, although the Juvenile Code permits petitioners to seek termination in the same district court that is simultaneously adjudicating an underlying abuse, neglect, or dependency petition, the statutory language does not mandate filing in a single court. *See* N.C.G.S. § 7B-1102(a) (2019) ("When the district court is exercising jurisdiction over a juvenile and the juvenile's parent in an abuse, neglect, or dependency proceeding, a person or agency specified in [N.C.G.S. §] 7B-1103(a) may file in that proceeding a motion for termination of the parent's rights in relation to the juvenile."). Thus, as the Court of Appeals has correctly held, a trial court lacks jurisdiction over a termination petition if the requirements of N.C.G.S. § 7B-1101 have not been met, even if there is an underlying abuse, neglect, or dependency action concerning that juvenile in the district in which the termination petition has been filed. *In re J.M.*, 797 S.E.2d 305, 306 (N.C. Ct. App. 2016). However, if the requirements of N.C.G.S. § 7B-1101 have been met in one county, then a district court in that county has jurisdiction, even if an abuse, neglect, or dependency action is pending in another county.[2] In this case, the petitioners were Ann's legal permanent guardians who filed their petition in the district court in the county where they

_____

[2] We note that Davidson County and Davie County are in the same judicial district.

resided with Ann, satisfying the requirements of N.C.G.S. § 7B-1101. Accordingly, we reject respondent's jurisdictional claim and turn to the merits of the termination order.

*b. Dependency*

A ground exists to terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)(6) if petitioners can prove by clear, cogent, and convincing evidence that "the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of [N.C.G.S. §] 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future." N.C.G.S. § 7B-1111(a)(6). In order for dependency to provide a basis for terminating parental rights, the petitioners must also prove that "the parent lacks an appropriate alternative child care arrangement." *Id.* In the present case, the parties do not dispute that due to respondent's mental health conditions, she is unable to care for her child. Instead, respondent argues that the trial court made no findings of fact which provide clear, cogent, and convincing evidence that she "lacks an appropriate alternative child care arrangement" for Ann. A review of the record shows that respondent is correct. The burden was on the petitioners to prove that N.C.G.S. § 7B-1111(a)(6) supported termination by "(1) alleg[ing] and prov[ing] all facts and circumstances supporting the termination of the parent's rights; and (2) demonstrat[ing] that all proven facts and circumstances amount to clear, cogent, and convincing evidence that the termination of such rights

is warranted." *In re Pierce*, 356 N.C. 68, 70, 565 S.E.2d 81, 83 (2002). The trial court's termination order contains no findings of fact addressing the availability to respondent, or lack thereof, of an alternative child care arrangement. Accordingly, the trial court's conclusion that the ground of dependency existed to terminate respondent's parental rights is not supported by clear, cogent, and convincing evidence, and its conclusion that respondent's parental rights may be terminated pursuant to N.C.G.S. § 7B-1111(a)(6) must be vacated.

Additionally, respondent asserts more broadly that the requirements of N.C.G.S. § 7B-1111(a)(6) cannot be satisfied in this case because Ann resides with legal permanent guardians. According to respondent, a legal permanent guardian is necessarily "an appropriate alternative child care arrangement" within the meaning of N.C.G.S. § 7B-1111(a)(6). In response, petitioners argue that the requirements of N.C.G.S. § 7B-1111(a)(6) have been satisfied because respondent did not herself identify, and is not presently able to identify, a viable alternative child care arrangement.

The effect of a child's placement with a legal permanent guardian on the requirements of N.C.G.S. § 7B-1111(a)(6) is a novel issue for this Court. However, this issue has been addressed by the Court of Appeals, which has concluded that the requirements of N.C.G.S. § 7B-1111(a)(6) are met even when a parent has acquiesced to a DSS-arranged placement, unless "*the parent . . . ha[s] taken some action* to identify [a] viable alternative[]" child care arrangement. *In re C.B.*, 245 N.C. App.

197, 211, 783 S.E.2d 206, 216 (2016) (emphasis added). As the Court of Appeals

explained in another case

> the fact that [the juvenile] was placed with his maternal
> grandmother cannot mean, without anything more, that
> respondent father had an alternative care arrangement. If
> this were the case, the requirement would be meaningless
> because, in the words of the guardian ad litem, "our courts
> will always do their best to ensure that someone" cares for
> children. Having an appropriate alternative childcare
> arrangement means that the parent himself must take
> some steps to suggest a childcare arrangement—it is not
> enough that the parent merely goes along with a plan
> created by DSS.

*In re L.H.*, 210 N.C. App. 355, 365–66, 708 S.E.2d 191, 198 (2011).

We begin by noting that N.C.G.S. § 7B-1111(a)(6) contains no language

indicating that it is the parent, and the parent alone, who must locate and secure an

appropriate alternative child care arrangement. *See King v. Town of Chapel Hill*, 367

N.C. 400, 404, 758 S.E.2d 364, 369 (2014) (determining that when ascertaining the

meaning of statutes, "we first must look to the plain language of the statutes

themselves"). Rather, the statute provides that it is the availability or unavailability

of an appropriate alternative child care arrangement, not the parent's success or

failure in identifying one, that determines whether or not N.C.G.S. § 7B-1111(a)(6)

supports the termination of parental rights. This Court has previously characterized

N.C.G.S. § 7B-1111(a)(6) utilizing language that accords with this understanding,

stating that a ground exists for terminating parental rights upon proof of "*the

[un]availability to the parent* of alternative child care arrangements." *In re K.L.T.*,

374 N.C. 826, 847, 845 S.E.2d 28, 43 (2020) (alteration in original) (emphasis added). By analogy, the statutory provision defining indigency for the purposes of assessing a defendant's eligibility for court-appointed counsel utilizes a similarly passive construction. *See* N.C.G.S. § 7A-450(a) (2019) ("An indigent person is *a person who is financially unable to* secure legal representation and to provide all other necessary expenses of representation . . . ." (emphasis added)). In construing N.C.G.S. § 7A-450, this Court held that it is the availability or unavailability of sufficient resources to secure legal representation that determines a defendant's eligibility for court-appointed counsel, not the defendant's personal role in obtaining those resources. *See State v. McDowell*, 329 N.C. 363, 373, 407 S.E.2d 200, 206 (1991) (holding that an otherwise indigent defendant was ineligible for assistant court-appointed counsel when family members paid for the defendant's private attorney). Similarly, the most natural reading of N.C.G.S. § 7B-1111(a)(6) is that it is the objective availability or unavailability of an appropriate alternative child care arrangement that is relevant in assessing dependency under N.C.G.S. § 7B-1111(a)(6), not the parent's personal role in securing the alternative arrangement.

This reading of N.C.G.S. § 7B-1111(a)(6) is consistent with the legislative intent embodied in North Carolina's Juvenile Code. *See, e.g., State v. Tew*, 326 N.C. 732, 738, 392 S.E.2d 603, 607 (1990) ("It is a cardinal principle that in construing statutes, the courts should always give effect to the legislative intent."). The overarching purpose of the Juvenile Code is the "protection of children by

constitutional means that respect both the right to family autonomy and the needs of the child." *In re T.R.P.*, 360 N.C. at 598, 636 S.E.2d at 794. It serves the state's interest in protecting children to authorize termination of parental rights when a parent is unable to provide appropriate care for a child and no appropriate alternative child care arrangement is available. However, when a parent is unable to provide appropriate care, but the child is residing with another appropriate permanent caretaker, then the parent's incapability does not itself supply a reason for the state to intervene to dissolve the constitutionally protected parent-child relationship. In this circumstance, requiring the parent to affirmatively identify an alternative child care arrangement threatens the parent's constitutional status without serving the state's *parens patriae* interest in the child's safety.

We disagree with the Court of Appeals that our interpretation of N.C.G.S. § 7B-1111(a)(6) renders the provision meaningless. Many of the provisions supplying grounds for terminating parental rights apply at some points in a juvenile proceeding and do not apply at others. There are still circumstances in which N.C.G.S. § 7B-1111(a)(6) will be a valid ground for terminating parental rights due to dependency. We emphasize that Ann currently resides with court-approved legal permanent guardians. Even if respondent could identify another appropriate alternative caregiver, respondent lacks legal authority to remove Ann from her guardians unless the trial court determines that terminating the guardianship serves Ann's best interests. N.C.G.S. § 7B-600(b) (2019). Thus, Ann will remain in her guardians' "care,

custody, and control" until she reaches the age of majority or until the trial court determines that guardianship is no longer in Ann's best interests, that the guardians are unfit or neglectful, or that the guardians are no longer willing or able to care for Ann. *See id.*

Permanent guardianship, which provides a child with stability and the opportunity to develop durable, healthy, dependent bonds with adult caregivers, is distinct from a temporary custodial arrangement which leaves a juvenile in a state of ongoing uncertainty. *See* Josh Gupta-Kagan, *The New Permanency*, 19 U.C. Davis J. Juv. L. & Pol'y 1 (2015) (describing how permanent guardianship serves the juvenile system's interest in permanency by facilitating stable placements and reducing unnecessary litigation); Sarah Katz, *The Value of Permanency: State Implementation of Legal Guardianship Under the Adoption and Safe Families Act of 1997*, 2013 Mich. St. L. Rev. 1079, 1089 (2013) ("[P]ermanent legal guardianship is widely recognized as a positive permanency outcome by a broad array of child-welfare experts . . . ."). Requiring the identification of an alternative child care arrangement serves a child's interest in permanency when the child is in the custody of an incapable parent or a temporary caregiver. But when the child resides with a permanent legal guardian, the parent's ability to identify an alternative child care arrangement is extraneous to

the concerns animating our Juvenile Code.[3] To construe N.C.G.S. § 7B-1111(a)(6) to be satisfied in this circumstance would make a parent's constitutional rights contingent on his or her ability to jump through an unnecessary procedural hoop. Accordingly, we hold that the requirements of N.C.G.S. § 7B-1111(a)(6) are not satisfied as a ground for terminating parental rights when, as in the present case, the parent's child has been placed with a legal permanent guardian pursuant to a valid order implementing the child's permanency plan. Because the requirements of N.C.G.S. § 7B-1111(a)(6) cannot be satisfied in the present case, a remand for further factual findings to address the availability to respondent of an appropriate alternative child care arrangement is unnecessary.

*c. Willful Abandonment*

In addition to N.C.G.S. § 7B-1111(a)(6), the trial court also found that termination was warranted pursuant to N.C.G.S. § 7B-1111(a)(7), which permits termination of parental rights if "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or

---

[3] When, as in this case, the guardianship results from the implementation of a juvenile's permanency plan, there is no reason for the mother to feel obligated to identify and propose an alternative child care arrangement which the parent will have no cause or authority to effectuate. By contrast, preliminary custody orders and other placement arrangements that recur throughout the history of abuse and neglect proceedings do not create the sorts of permanent alternative child care arrangements that suffice to preclude a finding that the parent's parental rights are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(6). Until a legal permanent guardianship has been established, a parent will still have reason to identify and propose an alternative child care arrangement.

motion." N.C.G.S. § 7B-1111(a)(7). Willful abandonment requires both actual abandonment and a "willful intent to abandon [a] child" which is "a question of fact to be determined from the evidence." *In re N.D.A.*, 373 N.C. 71, 77, 833 S.E.2d 768, 773 (2019). To find that a parent has willfully abandoned his or her child, the trial court must "find evidence that the parent deliberately eschewed his or her parental responsibilities in their entirety." *In re E.B.*, 375 N.C. at 318, 847 S.E.2d at 673. At the adjudicatory stage, the petitioner bears the burden of proving willful abandonment by clear, cogent, and convincing evidence. *In re N.D.A.*, 373 N.C. at 74, 833 S.E.2d at 771.

There is no dispute that the trial court failed to make any findings regarding respondent's conduct within the "determinative" six months preceding the filing of the termination petition. *See id.* at 77, 833 S.E.2d at 773 ("[A]lthough the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, the determinative period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." (cleaned up)). The trial court's order is also bereft of any factual findings or conclusions of law stating that respondent *willfully* abandoned her child. Thus, the trial court's conclusion of law that N.C.G.S. § 7B-1111(a)(7) supplied a ground for terminating respondent's parental rights is not supported by clear, cogent, and convincing evidence. *See In re Young*, 346 N.C. 244, 252, 485 S.E.2d 612, 617 (1997). Recognizing this deficiency, petitioners invite us to remand for further fact-finding,

asserting that there is evidence in the underlying record that could support a conclusion of law that respondent willfully abandoned Ann within the meaning of N.C.G.S. § 7B-1111(a)(7). *See Green Tree Fin. Servicing Corp. v. Young*, 133 N.C. App. 339, 341, 515 S.E.2d 223, 224 (1999) (determining that vacatur and remand is appropriate unless "the facts are not in dispute and only one inference can be drawn from them"). In particular, petitioners emphasize respondent's mental-health treatment records, which show that during the determinative six-month window, she continued to suffer from "delusions" and "struggle[s] with reality," persisted in her refusal to take prescribed medications, and became "easily agitated," "delusional," and "incoherent" during a visit with Ann.

To prove that termination of parental rights is warranted, petitioners carry the burden of proving that respondent "acted willfully in abandoning [her] child." *In re L.M.M.*, 375 N.C. 346, 353, 847 S.E.2d 770, 776 (2020). Even if it were correct that respondent actually abandoned Ann, nothing in the trial court's findings of fact supports the legal conclusion that respondent's behavior evinced a "purposeful, deliberative" intent to "forego all parental duties and relinquish all parental claims to the child." *In re A.G.D.*, 374 N.C. 317, 319, 841 S.E.2d 238, 240 (2020) (cleaned up). The evidence in the record also does not support this conclusion. Instead, the evidence shows that respondent's deficient conduct as a parent was largely, if not entirely, a manifestation of her severe mental illnesses. The trial court expressly found that respondent *intended* to be a parent to Ann, finding that she was "not capable of

providing proper care or supervision [to Ann], *even though she desires to do so.*" An entry in respondent's treatment records from the night before a scheduled visit with Ann states that respondent was "excited for [the] visit tomorrow." The record also confirms that respondent's actions did not always mirror her intentions—for example, on multiple occasions she attempted to demonstrate her love and affection for Ann by providing gifts and expressing concern for her child's well-being, although she frequently did so in misguided ways. Petitioners have not identified any evidence detracting from the obvious conclusion that respondent intended to parent Ann but, due to her mental health conditions, lacked the capacity to do so. Nothing in the record suggests that her conduct "manifest[ed] a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. at 251, 485 S.E.2d at 617 (citation omitted).

Evidence that respondent acted in a manner consistent with the symptoms of her severe mental illness is not, standing alone, evidence that she willfully intended to abandon her child. Nor does respondent's refusal to take prescribed medications transform her conduct into rational, volitional conduct, as both the trial court and petitioners imply. Respondent's refusal to take necessary medications may itself have resulted from the very mental health conditions that caused her to require treatment in the first place. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 231 (1990) (citing Harold I. Schwarz, William Vingiano & Carol Bezirganian Perez, *Autonomy and the Right to Refuse Treatment: Patients' Attitudes After Involuntary Medication*, 30

Hospital & Community Psychiatry 1049 (1988)) ("Particularly where the patient is mentally disturbed, his own intentions will be difficult to assess and will be changeable in any event."). Further, we agree with the Court of Appeals that, logically, there must be "[e]vidence showing a parent's ability, or capacity to acquire the ability, to overcome factors which resulted in their children being placed in foster care" in order to support the conclusion that a parent has willfully abandoned his or her child by failing to correct those conditions. *In re Matherly*, 149 N.C. App. 452, 455, 562 S.E.2d 15, 18 (2002). Thus, at a minimum, a trial court presented with evidence indicating that a mentally ill parent has willfully abandoned his or her child must make specific findings of fact to support a conclusion that such behavior illustrated the parent's willful intent rather than symptoms of a parent's diagnosed mental illness.[4]

Our reasoning should in no way be taken to suggest that every parent who struggles with a mental health condition lacks the capacity to make choices signifying an intent to abandon one's child. Rather, just as "[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision," *In re M.A.W.*, 370 N.C. 149, 153, 804 S.E.2d 513, 517 (2017) (alteration in original),

---

[4] Although it may be difficult to distinguish between a mentally ill parent who makes a volitional choice to refuse treatment and a mentally ill parent who refuses treatment because of his or her mental illness, courts must make a similar distinction when deciding if a mentally ill litigant is competent to refuse treatment or may be forcibly medicated against their expressed wishes. *See generally* Grant H. Morris, *Judging Judgment: Assessing the Competence of Mental Patients to Refuse Treatment*, 32 San Diego L. Rev. 343, 370 (1995).

behavior emanating from a parent's mental health conditions may supply grounds for terminating parental rights only "upon an analysis of the relevant facts and circumstances," such as the severity of the parent's condition and the extent to which the parent's behavior is consistent with recognizable symptoms of an illness. *In re K.N.*, 373 N.C. 274, 283, 837 S.E.2d 861, 868 (2020). In the present case, evidence that respondent "failed and refused to follow the medication regimen proposed by her doctors" and "dwelt in her mental illness" is insufficient to support the conclusion that she willfully abandoned Ann. Because there is no evidence in the record showing (1) that her failure to follow the medication regimen was itself a willful act, and (2) that compliance with her medication regimen would have enabled her to cure the parenting deficiencies caused by her mental illnesses, there is no cause to remand for further fact-finding.

We emphasize that our decision in this case does not threaten the petitioners' status as Ann's legal permanent guardians, although we acknowledge the tangible and symbolic differences between guardianship and parenthood. However, the protections provided to parents by our Juvenile Code and by our federal and state constitutions are enjoyed by healthy and infirm parents alike. Moreover, parents who cannot provide for their children as independent caregivers may still be able to maintain a limited but meaningful bond with their children that may benefit both the parent and the child, a bond which may grow over time if the parent-child relationship is preserved and the parent's condition improves. *See, e.g., In re Cameron*

*B.*, 154 A.3d 1199, 1201 (Me. 2017) ("When it is appropriate, a permanency guardianship allows parents whose children cannot be returned to them to have a meaningful opportunity to maintain a legal relationship with their children and to have the court determine their rights to have contact with their children."). Although respondent's mental health challenges obviously interfere with her ability to be a parent to Ann, her condition is not prima facie evidence that her parental rights may be terminated.

## Conclusion

The Davie County District Court had subject-matter jurisdiction to enter the order terminating respondent's parental rights, notwithstanding the prior order establishing petitioners as Ann's permanent guardians entered by the Davidson County District Court in the underlying dependency proceeding. However, petitioners have failed to carry their burden of proving the existence of a ground for terminating parental rights by clear, cogent, and convincing evidence. Because the requirements of N.C.G.S. § 7B-1111(a)(6) have not been met when a child has been placed with permanent legal guardians and because there is no evidence in the record indicating that respondent willfully abandoned her child, we reverse the trial court's order terminating respondent's parental rights.

REVERSED.

Justice NEWBY concurring in part and dissenting in part.

I agree with the majority that the district court had subject matter jurisdiction to terminate respondent's parental rights. I disagree with the majority's conclusion to reverse the termination of respondent's parental rights under subsections 7B-1111(a)(6) and (a)(7) of our General Statutes. This case involves a mother who is unable to parent her child due to severe mental illness that, according to the trial court's findings and evidence in the record, has only deteriorated in the over four years since the child was born. The majority, for policy reasons of its own, chooses guardianship over adoption, invalidating the trial court's decision to terminate respondent's parental rights on these two grounds, subsections 7B-1111(a)(6) and (a)(7). It does so by making its own findings, rendering a portion of the relevant statutes meaningless, and relying on social science articles and out-of-state cases that do not effectuate the purpose and intent of North Carolina's statutes providing for termination of parental rights. I would conclude that both grounds for termination are satisfied here. As such, I concur in part and dissent in part.

The first ground upon which the trial court terminated respondent's rights was dependency. Subsection 7B-1111(a)(6) provides that a parent's rights may be terminated when

> the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that the incapability

> will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, intellectual disability, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.

N.C.G.S. § 7B-1111(a)(6) (2019). Therefore, in addition to showing an incapability to care for the child, there must also be a showing that "the parent lacks an appropriate alternative child care arrangement."

There is no dispute that respondent is incapable of parenting the child in this case. Additionally, it is clear that, in the four years between the child's birth and the termination hearing, respondent was never able to identify an alternative childcare arrangement. The trial court order and record here show that from the time the child was born, respondent was unable and unwilling to provide the necessary information to establish an alternative childcare arrangement opportunity, beginning with her unwillingness to give any identifying information as to the child's father. Thus, the express statutory language is met. The majority now holds, however, that when DSS places the child in an arrangement that results in permanent guardianship, the requirements of subsection 7B-1111(a)(6) can never be met. Simply fulfilling its statutory duty, DSS arranged for a suitable home for the child without any assistance from respondent. Contrary to the majority's holding, a trial court can find that the dependency ground exists despite the fact that a child is placed in a permanent guardianship. Since 2011, the Court of Appeals has interpreted subsection 7B-

1111(a)(6) to mean "the parent must have taken some action to identify viable [childcare] alternatives." *In re L.H.*, 210 N.C. App. 355, 364, 708 S.E.2d 191, 197 (2011). If this interpretation were wrong, the General Assembly would have acted to correct it. Now the majority overrules this ten-year-old precedent.

The majority reasons that the statutory language does not require a parent to have identified any alternative childcare arrangement; in the majority's view, where DSS has established an appropriate alternative childcare arrangement, the second prong of subsection 7B-1111(a)(6) cannot be satisfied. The majority reasons that so long as "the child is residing with another appropriate permanent caretaker, then the parent's incapability does not itself supply a reason for the state to intervene" to terminate a respondent's parental rights. Even more concerning, the majority reasons that the alternative childcare arrangement element is never "satisfied as a ground for terminating parental rights when, as in the present case, the parent's child has been placed with a legal permanent guardian," even when respondent has not participated in identifying a permanent guardian for the child. Thus, the majority holds that where DSS acts in a way to protect the child by identifying a family that can serve as a permanent guardian when the parent is incapable of caring for the child, the parent's rights can never be terminated on dependency grounds.

Surely this reasoning cannot be correct given that DSS frequently has to identify a placement for a child upon that child's removal from the home and does so without any input from the parent. As the Court of Appeals has previously

recognized, a holding to the contrary renders the second portion of subsection 7B-1111(a)(6) meaningless, which could not have been the General Assembly's intent in crafting the precise language and requirements of this statutory provision. *See In re L.H.*, 210 N.C. App. at 365–66, 708 S.E.2d at 198 ("[T]he fact that [the child] was placed with his maternal grandmother cannot mean, without anything more, that respondent father had an alternative care arrangement. If this were the case, the [statutory] requirement would be meaningless because, in the words of the guardian ad litem, 'our courts will always do their best to ensure that someone' cares for children."). The fact that DSS has identified an alternative placement does not relieve a parent from his or her obligation to show, when dependency arises, that there is an alternative childcare placement that should prevent termination of parental rights. The majority's opinion to the contrary creates a Catch-22 situation for DSS, discouraging DSS from immediately identifying a placement for the child because they will later be precluded from terminating a parent's rights on dependency grounds.

Moreover, it is the General Assembly, not this Court, that should make policy decisions. The General Assembly has decided as a matter of policy that a parent's rights may be terminated in dependency situations where the parent has a mental illness that makes parenting impossible. As clearly stated in our statutes, "it is in the public interest to establish a clear judicial process for adoptions, [and] to promote the integrity and finality of adoptions." N.C.G.S. § 48-1-100(a) (2019); *see also* N.C.G.S.

§ 48-1-100(b) (2019) (discussing that it is desirable to "advance the welfare of minors by . . . facilitating the adoption of minors in need of adoptive placement by persons who can give them love, care, security, and support"). The majority here advances its own policy preferences, favoring permanent guardianship over adoption, instead of deferring to the policy enactments of the General Assembly. The legislature will have to intervene now that the majority has rendered subsection 7B-1111(a)(6) meaningless under these circumstances.

The trial court also terminated respondent's parental rights based on N.C.G.S. § 7B-1111(a)(7) (2019), the willful abandonment ground for termination. Subsection 7B-1111(a)(7) provides that a trial court may terminate a parent's parental rights if "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion."

Though the trial court here did not explicitly reference the six months preceding the termination hearing, it is clear the trial court considered the relevant period since it made numerous findings related to respondent's abandonment of the child. The trial court noted that respondent persistently brought the child inappropriate gifts, consistently refused medication treatment for her mental illness, failed to comply with her physicians' recommendations, testified about the out-of-body experiences she has had and the times she has put herself in dangerous situations, and continuously demonstrated psychosis, mania, anger, poor insight, and poor impulse control without showing any improvement in the four years before the

hearing. The trial court stated that, "[s]ince the child was born, the Respondent Mother's mental health status has deteriorated." Based on the fact that, when viewed as a whole, there is evidence in the record that supports the trial court's decision to terminate respondent's parental rights based on her conduct within the relevant six-month period, I would also uphold termination on this basis as well.

The majority finds facts not in the trial court order or the record about respondent's ability to parent the child and then concludes that there is no evidence that respondent's actions have been willful. Supporting its approach with various social science articles not presented to the trial court and cases from other states, the majority reasons that where a parent has a mental illness, in many cases, the trial court will not be able to determine that an individual's actions are willful if they can be attributable to an individual's mental illness. Though the majority notes that courts must make distinctions about the willfulness of mental capacity in other circumstances, the majority removes the trial court's ability to make a willfulness determination here; instead, it finds that the trial court should not have concluded that respondent's actions could be categorized as willful. In short, the majority assumes itself to be in a better position to judge the willfulness of respondent's conduct from a cold record than the trial court which personally observed respondent.

Under the type of reasoning that the majority advances, the more severe the mental illness, the less likely it will be for the trial court to terminate parental rights based on any ground requiring a willfulness determination. This approach will leave

children in legal limbo, unable to be adopted so long as a biological parent suffers from a significant mental health disorder. Thus, the chances of permanency through adoption will dramatically decrease as a parent's mental illness worsens. Surely this reasoning does not support the legislative goals of promoting the physical and emotional well-being of the child and providing permanency for juveniles at the earliest possible age. *See* N.C.G.S. § 7B-1100(1), (2) (2019). Nor does this reasoning promote the clearly established goal to facilitate and promote the integrity and finality of adoptions. *See* N.C.G.S. § 48-1-100(a), (b). The majority's new policy-driven standard for preventing termination of parental rights in cases in which the parent has worsening mental illness undermines expressly stated statutory goals for termination. The General Assembly will also need to address this issue.

To achieve its policy outcome the majority's opinion sets an unrealistic standard for termination that undermines the goals set forth in our termination statutes and ignores express statutory language. It places its policy preferences over those enacted by the legislature. I would affirm termination of respondent's parental rights on both grounds. Therefore, I concur in part and dissent in part.