STATE OF NORTH CAROLINA v. JAMES ALFONZO POWELL

No. 50

(Filed 12 June 1979)

1. Burglary and Unlawful Breakings § 7— first degree burglary—question of whether dwelling occupied—necessity for submitting second degree burglary

The trial court in a first degree burglary case erred in failing to submit to the jury the lesser included offense of second degree burglary where the evidence tended to show that the occupants returned to the dwelling at 9:30 p.m. and went to bed in separate bedrooms at 10:00 p.m. without looking in the third bedroom; entry to the dwelling was gained by breaking a window in the unoccupied bedroom but neither occupant was awakened by the sound of shattering glass; there was a hammer, a screwdriver and a small steak knife in the third bedroom, and the overhead light fixture and light bulbs were found on the bed; and an intruder was in the dwelling and committed certain acts between 1:00 a.m. and 3:00 a.m., since the jury could have found that the intruder entered the house when it was unoccupied, was there when the occupants came home later that night, and waited in the third bedroom until the occupants were asleep before he acted.

2. Searches and Seizures § 14— consent for limited search for identification—discovery of stolen wallet

The trial court properly refused to suppress a stolen wallet found by officers in defendant's room where defendant falsely told officers that he was Tommy Davis and that the James Alfonzo Powell the police were looking for was his cousin, who was at a different address; defendant specifically invited the officers to conduct a limited search of his room for identification; an officer saw the billfold in a partially opened dresser drawer, stated, "I have got his wallet," opened it up and discovered it was one stolen during a burglary; and the examination by the officers was reasonably restricted to the purpose of seeking identification.

**3. Searches and Seizures § 13— consent to search—Miranda warnings not necessary**

The *Miranda* warnings need not be given by officers before obtaining consent to a search.

**4. Criminal Law § 75.9— volunteered statements—Miranda warnings not necessary**

Defendant's statements in which he gave officers a false name and falsely told them the person they were looking for was his cousin who lived at a different address were volunteered and were admissible although no *Miranda* warnings had been given.

**5. Criminal Law § 92.4— consolidation of charges from two incidents**

The trial court did not err in consolidating for trial charges against defendant of first degree burglary, first degree rape, two cases of felonious assault, secret assault, felonious breaking and entering, two cases of felonious larceny, felonious larceny of a firearm, and receiving stolen property where all charges arose from two break-ins of the same dwelling house some four days apart by a black man in faded green or khaki pants, and the two incidents were close enough in time, place and circumstance that defendant was not prejudiced by having to defend charges arising from them in one action.

APPEAL by defendant from the judgment of *Martin (John) J.*, entered in the 18 September 1978 Criminal Session of DURHAM County Superior Court.

The defendant was charged, in indictments proper in form, with first degree burglary, first degree rape, two cases of assault with a deadly weapon with intent to kill inflicting serious injury, secret assault, felonious breaking and entering, two cases of felonious larceny, felonious larceny of a firearm, receiving stolen property and felonious possession of a firearm by a convicted felon. All the cases except felonious possession of a firearm by a convicted felon were consolidated for trial.

At trial the evidence for the State tended to show the following:

At about 9:30 p.m. on 28 April 1978 Reverend Paul Baynard and his wife returned home from a trip to Asheville. They went to bed in separate rooms at about 10:00 p.m., and Reverend Baynard read until approximately 1:00 a.m.

In the early morning hours of 29 April 1978 Reverend Baynard was awakened by a sting on his head, which he discovered was bleeding profusely. He walked in a daze into his

wife's room. She was gone, and there was a puddle of blood on the floor by her bed. A metal pipe was lying nearby. Reverend Baynard wandered outside looking for his wife, and he saw someone go into his house through a window. He reentered his home and saw a black male in the hallway. Reverend Baynard then went next door, and the police were called. When he and his neighbor returned to the Baynard residence shortly thereafter, at about 3:00 a.m., his wife was back in the house and the police had arrived. Reverend Baynard noticed that his billfold was missing after the incident.

Mrs. Baynard testified that she was awakened in the early morning of 29 April 1978 by the sound of a man in her bedroom doorway "with kind of a huffing noise." The black man beat her on the head and tied a rag around her face and mouth. He then dragged her outside and raped her, telling her he would kill her if she resisted.

Reverend Baynard had to have thirty stitches as a result of the blow to his head, Mrs. Baynard had twenty-three stitches in her head. Neither of them could identify the man who attacked them.

At approximately 10:30 a.m. on 3 May 1978 Reverend W. C. Webb went to the Baynard home. He rang the doorbell and then heard glass rattling. Immediately thereafter Reverend Webb saw a black man walking through a vacant lot next door, and he noticed a storm window shattered on the Baynard driveway. The police were called. Clothes from the dressers and closets were strewn all over the bedroom floors, and there was a suitcase on the dining room table containing packages of frozen meat. Reverend Baynard testified that his .22 caliber rifle and a coin box he had made were taken.

Investigations were made after the break-ins on 29 April 1978 and 3 May 1978. Numerous fingerprints were lifted. A fingerprint expert testified that in his opinion several of the prints matched those of the defendant.

At about 7:00 a.m. on 8 May 1978 Mrs. Carrie Ellerbe went to a Durham police station and reported a disturbance at her house on 304 North Guthrie Street involving a gun. Four policemen went to that address and were informed that the person who

owned the gun was upstairs in one of the bedrooms. When the officers entered the room the defendant rented from Mrs. Ellerbe, the defendant was in bed. The police subsequently arrested him and found Reverend Baynard's wallet and coin box in the room. The gun that was taken from the Baynard house on 3 May 1978 was found downstairs in Mrs. Ellerbe's house.

. The defendant presented no evidence.

The jury found the defendant guilty of first degree burglary, second degree rape, two assaults inflicting serious injury, two felonious larcenies and felonious breaking and entering. They found the defendant not guilty of secret assault and felonious larceny of a firearm. The defendant was sentenced to life imprisonment on the first degree burglary conviction and imprisonment for forty years on the second degree rape conviction, to run consecutively with the life sentence. All the remaining convictions were consolidated for judgment, for which the defendant was sentenced to imprisonment for ten years, to run concurrently with the forty-year sentence imposed for second degree rape. The defendant appealed by right to this Court on his conviction for first degree burglary, and we granted his motion to bypass the Court of Appeals on all the remaining cases on 16 February 1979.

Other facts relevant to the decision will be included in the opinion below.

*O. Hampton Whittington, Jr. for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Thomas B. Wood for the State.*

. COPELAND, Justice.

For the reasons stated below, we must grant the defendant a new trial on his burglary conviction, and we find no error in the remaining convictions.

[1] In his first assignment of error, the defendant contends the trial court erred in not submitting to the jury the lesser included offense of second degree burglary as an alternative to a verdict of first degree burglary. We agree; therefore, the defendant must be granted a new trial on his conviction of first degree burglary.

In *State v. Tippett*, 270 N.C. 588, 155 S.E. 2d 269 (1967), Mr. and Mrs. Patton had been entertaining guests at their home all evening. At about 11:00 p.m. they both left and drove the guests home. The Pattons got back home about half an hour later and went directly to bed in separate bedrooms, but neither of them looked into the third bedroom before retiring. Mrs. Patton read until about 12:30 a.m. She was later awakened by the defendant, who raped her.

In *Tippett* the trial court submitted the charges of first and second degree burglary to the jury, and the defendant was found guilty of second degree burglary. Noting that "the house was unoccupied for approximately half an hour immediately before Mr. and Mrs. Patton returned to it and retired for the night without going into the third bedroom of the house," this Court found no error in instructing on second degree burglary even though "where all the evidence is to the effect that the building was actually occupied at the time of the breaking and entry, the court is not authorized to instruct the jury that it may return a verdict of burglary in the second degree." *Id.* at 595, 155 S.E. 2d at 274.

In *State v. Allen*, 279 N.C. 115, 181 S.E. 2d 453 (1971), Mr. Johnson was visiting his eighty-seven year old mother at her home. He testified that his mother went to bed, and right after that, at about 10:00 p.m., he left. The defendant's statement to police officers indicated that he entered one room of Mrs. Johnson's home around midnight, saw no one and took a television set. Mrs. Johnson did not testify, Justice Lake, speaking for this Court, stated:

> "While this evidence would permit the jury to draw an inference that Mrs. Johnson was in the house at the time the defendant broke and entered, it does not, even if true, compel a finding to that effect. Consequently, the question of whether the house was actually occupied at the time of the breaking and entering was for the jury, and had there been no announcement by the solicitor [that he was proceeding against the defendant only on a charge of second degree burglary], it would have been necessary for the court to submit to the jury, as possible verdicts, both burglary in the first degree and burglary in the second degree, depending

upon whether they found, upon this evidence beyond a reasonable doubt, that the house was or was not occupied at the time of the breaking and entering." *Id.* at 119, 181 S.E. 2d at 456.

In the case before us, there is no positive evidence as to when the intruder first entered the Baynard home on 28 or 29 April 1978. There is no evidence that Reverend or Mrs. Baynard checked the third bedroom before retiring. The record does indicate, however, that entry to the house was gained by breaking a window in the unoccupied bedroom, but neither Reverend nor Mrs. Baynard was awakened by the sound of shattering glass. A policeman who investigated the case testified that there was a hammer, a screwdriver and a small steak knife in the third bedroom, and the overhead light fixture and light bulbs were found on the bed. Thus, the jury could have found that the intruder entered the house when it was unoccupied, got caught there when the Baynards came home later that night and waited in the third bedroom until Reverend Baynard went to sleep before he acted. Under these facts, the trial court was required to submit second degree burglary to the jury as a possible verdict. Its failure to do so entitles the defendant to a new trial on his conviction for first degree burglary.

[2] Defendant also argues the trial court erred in not granting his motion to suppress from evidence the items seized from his room by the policemen. We do not agree.

On 8 May 1978 four Durham policemen went to defendant's room to investigate a reported disturbance involving a gun. Officer Taylor knocked on defendant's bedroom door that was ajar, and the defendant said, "Yes." Officer Taylor identified himself as a policeman, said he would like to talk with him and then entered the room. The defendant, who was lying in bed, identified himself as Tommy Davis and stated that he had moved there three weeks ago from 416 East Geer Street.

Two other police officers in the room recognized the defendant as being James Alfonzo Powell because of a flyer they had received the previous day specifying that Powell was to be picked up for a felony charge in Fayetteville. One of the addresses given for Powell was 414 East Geer Street. These two officers then

walked over to the bed and asked the defendant to stand up. As he did, they handcuffed him and told him he was under arrest.

At this point the defendant volunteered that the officers were looking for James Alfonzo Powell who was his cousin and who defendant claimed was "at 414 East Geer Street right now. If you go over there you can get him." One of the officers asked if he had any identification to show that he was not James Alfonzo Powell because "even though I [the officer] knew in my mind it was James Alfonzo Powell, I felt that I was obligated under duty of my office to at least give him some benefit of a doubt." After the defendant claimed he had no identification, the policemen asked him if they could look for identification. The defendant replied that he had nothing to hide, and the officers could look if they wished. Officer Johnson said, "Now, are you sure," and the defendant said, "Please look, and get over there because he will be gone before you can get there."

One officer stepped over to the dresser, noticed a wallet in a partially open drawer and said, "I have got his wallet." He then opened it up and discovered it was Reverend Baynard's wallet. At the same time another officer unfolded a piece of paper that was lying on a table and saw it was a birth certificate with the name of James Alfonzo Powell on it. At this point the officers ceased their search. A search warrant was obtained, and a subsequent examination of defendant's room resulted in the seizure of some clothing and the coin box that was taken from the Baynard residence on 3 May 1978.

After a pretrial hearing on defendant's motion to suppress the evidence, the court made findings of fact and conclusions of law. In denying the motion, the court found, *inter alia*, that "the defendant specifically invited and directed the officers to look about the room for identification and in doing so the defendant freely and voluntarily and unequivocally gave his consent to a limited search of the room for identification." We agree.

It is beyond dispute that a search pursuant to the rightful owner's consent is constitutionally permissible without a search warrant as long as the consent is given freely and voluntarily, without coercion, duress or fraud. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed. 2d 854, 93 S.Ct. 2041 (1973). *See also State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971); *State v. Virgil*, 276

N.C. 217, 172 S.E. 2d 28 (1970). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra* at 227, 36 L.Ed. 2d at 862-63, 93 S.Ct. at 2047-48.

The defendant claims that his consent was not given voluntarily because he was in custody at the time, had not been given his *Miranda* warnings and had not been told that he had the right not to consent to the search. Although all these factors are to be considered in determining the voluntariness of the consent, they are not, taken either alone or together, conclusive. *See generally Schneckloth v. Bustamonte, id.*

In this case the defendant "specifically invited" the policemen to search his room, obviously to supply credibility to his story that he was Tommy Davis and that the James Alfonzo Powell the police were looking for was his cousin, who was at a different address. There is absolutely no evidence that the officers used any duress or coercion to induce defendant's consent to a limited search for identification. Furthermore, the examination by the officers was reasonably restricted to that purpose. The only evidence of fraud was that which the defendant was attempting to perpetrate on the officers. Under these facts, the trial court correctly denied defendant's motion to suppress. This assignment of error is overruled.

[3, 4] The defendant next claims the trial court erred in allowing into evidence certain statements he made to the policemen in his room on 8 May 1978 after he had been arrested when he had not been given his *Miranda* warnings.

Before introducing Reverend Baynard's wallet and coin box into evidence, Officer Taylor and Officer Hanan testified as to what occurred in defendant's room on the morning of 8 May 1978. The only statements made by the defendant after he was arrested that were testified to were his answers to the officers' request to search the room for identification and his volunteered assertions that he was not James Alfonzo Powell and that the policemen were looking for his cousin, who was at 414 East Geer Street. The defendant had identified himself as Tommy Davis when the officers first entered the room and before he was arrested.

The officers did not give the defendant his *Miranda* warnings while in the room because "we did not intend to interrogate him." "However, the warnings required by *Miranda v. Arizona*, 334 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, in order to make competent a confession made in custody, need not be given by officers before obtaining the consent of the owner to a search of his premises." *State v. Vestal, supra* at 579, 180 S.E. 2d at 767. Furthermore, the evidence clearly shows that the defendant's comments as to his cousin being James Alfonzo Powell were volunteered by him as soon as he was arrested. They were not in response to any interrogation; therefore, they were admissible despite the fact that no *Miranda* warnings had been previously given. *See, e.g., State v. Jackson*, 280 N.C. 563, 187 S.E. 2d 27 (1972). Thus, the argument that the policeman failed to give *Miranda* warnings is without merit.

[5] Defendant contends the trial court erred in refusing to grant his motion to sever some of the charges against him. We do not agree.

The State made a motion to consolidate all the charges against the defendant, and the defendant moved to sever the charges stemming from the 29 April 1978 occurrence from the charges resulting from the 3 May 1978 incident. After a pretrial hearing on the matter, the court found:

"1. That the defendant is charged on several bills of indictment with various charges each of which is stated as a separate count as required by N.C.G.S. 15A-924;

2. That the evidence as offered by the State tends to show a series of offenses connected together as parts of a common scheme;

3. That the several offenses were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others; and

4. That the joinder for the purpose of trial of the offenses . . . will not prejudice a fair determination of the defendant's guilt or innocence of each offense."

The court did, however, grant the defendant's motion to sever the charge of felonious possession of a firearm by a convicted felon

because "joinder for trial of [that charge] with the remaining cases may prejudice a fair determination of the defendant's guilt or innocence of each offense."

G.S. 15A-926(a) states that "[t]wo or more offenses may be joined . . . for trial when the offenses, whether felonies or misdemeanors or both, are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan." Thus, there must be some sort of "transactional connection" between cases consolidated for trial. *See State v. Greene*, 294 N.C. 418, 241 S.E. 2d 552 (1978).

In this case there are two incidents some four days apart involving a break-in of the same dwelling house by a black man in faded green or khaki pants. In both instances the man seemed to be working alone and on foot, and he apparently entered the house by breaking a bedroom window. Both times the intruder stole items from the house. A motion for joinder of offenses is addressed to the sound discretion of the trial judge. *Id.* There has been no showing the court abused its discretion in this case.

Furthermore, the defendant has not pointed to how he was prejudiced from the joinder.

"[I]n determining whether an accused has been prejudiced by joinder '. . . The question is not whether the evidence at the trial of one case would be competent and admissible at the trial of the other. The question is whether the offenses are *so separate in time and place* and *so distinct in circumstances* as to render a consolidation unjust and prejudicial to defendant.'" *State v. Greene, supra* at 423, 241 S.E. 2d at 665 (quoting *State v. Johnson*, 280 N.C. 700, 704, 187 S.E. 2d 98, 101 (1972). (Emphasis in original.)

Clearly, these two events were close enough in time, place and circumstances that the defendant was not prejudiced by having to defend the charges arising from them in one action. This assignment of error is overruled.

Defendant argues the trial court erred in denying his motion to dismiss the charges against him at the close of the State's evidence.

In his brief to this Court "defendant concedes that there was probably enough evidence to go to the jury on all the charges except receiving stolen property, which the court dismissed." Defendant also admits the court correctly charged the jury on the doctrine of recent possession of stolen property. There is no doubt that the trial court correctly denied defendant's motion to dismiss. This argument is without merit.

As to the first degree burglary conviction, defendant is granted a NEW TRIAL. As to the remaining convictions, we find NO ERROR.