IN THE SUPREME COURT OF NORTH CAROLINA

No. 258PA23

Filed 22 August 2025

STATE OF NORTH CAROLINA

v.

ERIC WAYNE WRIGHT

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 290 N.C. App. 465, 892 S.E.2d 253 (2023), reversing and vacating an amended order entered 28 July 2022 by Judge Lisa Bell in Superior Court, Mecklenburg County. Heard in the Supreme Court on 25 February 2025.

*Jeff Jackson, Attorney General, by Caden William Hayes, Assistant Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Katy Dickinson-Schultz, Assistant Appellate Defender, for defendant-appellee.*

*Daniel K. Siegel, Bridget Lavender, and Michele Delgado for American Civil Liberties Union and American Civil Liberties Union of North Carolina, amici curiae.*

NEWBY, Chief Justice.

In this case we address whether law enforcement officers violated defendant's Fourth Amendment rights by searching defendant's backpack, which contained a stolen handgun, with defendant's consent. Warrantless searches are permissible when a defendant gives voluntary consent under the totality of the circumstances. Here the circumstances, including the trial court's properly supported finding that

officers returned defendant's identification, show that defendant voluntarily consented to the search of his backpack. We therefore reverse the decision of the Court of Appeals.

On 29 January 2020, Charlotte-Mecklenburg Police Department Officers Nicholas Krause and Christopher Martin received a tip from a confidential informant that a man matching defendant's description was riding a bicycle and carrying an illegal firearm on Phifer Street. The officers subsequently located defendant with a bicycle on Phifer Street. When defendant took a shortcut on a dirt path marked with a "No Trespassing" sign, Officer Benjamin Slauter followed him while Officers Krause and Martin drove around to intercept defendant. In response to the officers' questions, defendant provided his identification card. Officer Martin asked defendant to step off his bicycle and remove his backpack, which he did. With defendant's permission, Officer Martin conducted a protective pat-down. Throughout their interaction with defendant, officers never raised their voices or brandished their weapons.

After the pat-down, Officer Martin asked defendant several times for permission to search defendant's backpack for weapons. Defendant agreed to the initial request but changed his mind and subsequently declined multiple times to allow officers to search his backpack, telling them he was scared. Officer Slauter then asked defendant to open his backpack so the officer could look inside, and defendant agreed to this request. To see the contents, Officer Slauter asked defendant to lower

the backpack, and the officer saw the grip of a handgun in the backpack. Officers placed defendant in handcuffs, and upon learning he would be searched incident to arrest, defendant informed Officer Slauter that defendant had cocaine in his pocket. The officers later determined that the handgun found in defendant's backpack was stolen.

Defendant was charged with possession with intent to sell cocaine, unlawfully carrying a concealed weapon, possession of a stolen firearm, possession of a firearm by a felon, and attaining the status of a habitual felon. On 2 September 2020, he moved to suppress the evidence obtained during the search, contending that the officers lacked reasonable suspicion and probable cause. The trial court denied defendant's motion. In Finding of Fact 20, it concluded "[t]hat Officer Martin appeared to have retu[r]ned [d]efendant's identification card based on the conversation between them and the actions that were visible on the [body worn camera]."[1] The trial court further decided that defendant "freely consented to opening his backpack and therefore allowed for the legal search of his property" and that the tip from the informant in conjunction with the officers' knowledge of the area provided reasonable suspicion and probable cause. Defendant gave notice of appeal from the trial court's ruling and entered an *Alford* plea to all charges.[2] Defendant was

---

[1] This finding is numbered 13 in the trial court's original order and 20 in the amended order. For clarity, we refer to it throughout as "Finding of Fact 20."

[2] Under *North Carolina v. Alford*, a trial court may accept a guilty plea where the defendant does not concede his guilt but consents to being sentenced by the trial court. 400 U.S. 25, 37, 91 S. Ct. 160, 167 (1970). "An individual accused of crime may voluntarily,

sentenced to 87 to 117 months in prison.

The Court of Appeals vacated and remanded for further findings of fact and conclusions of law regarding whether defendant trespassed by taking the dirt path and whether officers reasonably believed he had trespassed. *State v. Wright*, No. 21-247, slip op. at 5–7 (N.C. Ct. App. May 17, 2022) (unpublished). The trial court entered an amended order denying defendant's motion to suppress, again finding that officers returned defendant's identification and holding that defendant consented to the backpack search and the officers had reasonable suspicion and probable cause for the stop. Defendant untimely appealed from the amended order and filed a corresponding petition for a writ of certiorari with the Court of Appeals. *State v. Wright*, 290 N.C. App. 465, 470, 892 S.E.2d 253, 259 (2023).

The Court of Appeals granted defendant's petition for a writ of certiorari. *Id.* at 470–71, 892 S.E.2d at 259. The Court of Appeals held that Finding of Fact 20 was not supported by competent evidence. *Id.* at 472–73, 479, 892 S.E.2d at 261, 265. Moving to the legality of the search, the Court of Appeals held that the tip provided by the informant, with whom Officer Martin had worked for nearly a year and who previously had provided information that had been corroborated, supported reasonable suspicion to stop and frisk defendant but not probable cause to search defendant's backpack. *Id.* at 474–75, 478–79, 892 S.E.2d at 261–62, 264–65. The

knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.*

-4-

Court of Appeals also determined that defendant did not voluntarily consent to the search of his backpack. *Id.* at 476–78, 892 S.E.2d at 263–64. The court emphasized the repetition and frequency of the officers' questions, the circumstances of the stop, and defendant's statement that he was scared. *Id.* at 477–78, 892 S.E.2d at 263–64. In the court's view, under the totality of the circumstances, "[defendant's] consent was the result of coercion and duress and therefore was not freely given." *Id.* at 477–78, 892 S.E.2d at 264. Therefore, the Court of Appeals reversed the amended order and vacated defendant's *Alford* plea. *Id.* at 479, 892 S.E.2d at 265.

The State filed a petition for discretionary review in this Court, challenging the Court of Appeals' holdings regarding Finding of Fact 20, probable cause, and the voluntariness of defendant's consent. We allowed the State's petition.

We review the denial of a motion to suppress to determine whether competent evidence supports the trial court's findings of fact and whether those factual findings support the trial court's conclusions of law. *State v. Tripp*, 381 N.C. 617, 625, 873 S.E.2d 298, 305 (2022). A "trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington*, 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000)). This is so because "[t]he trial judge who presides at a suppression hearing 'sees the witnesses, observes their demeanor as they testify and by reason of his more favorable position, he is given the responsibility of discovering the truth.'" *State v. Bartlett*, 368 N.C. 309, 313, 776

S.E.2d 672, 674 (2015) (quoting *State v. Smith*, 278 N.C. 36, 41, 178 S.E.2d 597, 601 (1971)). "Competent evidence is 'evidence that a reasonable mind might accept as adequate to support the finding.' " *Smith v. Smith*, 387 N.C. 255, 258, 912 S.E.2d 762, 765 (2025) (quoting *In re J.M.*, 384 N.C. 584, 591, 887 S.E.2d 823, 828 (2023)). "Conclusions of law are reviewed de novo," where " 'the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (quoting *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008)).

The Fourth Amendment to the Federal Constitution protects citizens against unreasonable searches and seizures by government actors. U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973).

The Supreme Court has held that

> the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be

no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

*Id.* at 228, 93 S. Ct. at 2048. "For a consent search to be valid, the State has the burden of proving that consent was freely and voluntarily given, without coercion, duress[,] or fraud." *State v. Long*, 293 N.C. 286, 293, 237 S.E.2d 728, 732 (1977) (citing *Schneckloth*, 412 U.S. at 227, 91 S. Ct. at 2048). Whether a defendant's consent to a search is voluntary or the result of coercion is a question of fact based on the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 248–49, 93 S. Ct. at 2047–48, 2058–59; *State v. Powell*, 297 N.C. 419, 425–26, 255 S.E.2d 154, 158 (1979).

Defendant argues that the trial court's finding of fact that officers returned defendant's identification is unsupported by competent evidence. After Officer Martin patted defendant down for a weapon, defendant asked him, "We good?" Officer Martin replied, "Yeah, you good," and defendant thanked the officer. This interaction provides competent evidence that reasonably supports Finding of Fact 20, that officers returned defendant's identification. We therefore turn to whether the trial court's findings of fact support its conclusion of law that defendant voluntarily consented to the search of his backpack.

During their interaction with defendant, Officers Martin and Slauter maintained a calm and conversational demeanor, never raising their voices or brandishing their weapons. Defendant told officers that he was scared of them but did not explain why. Defendant initially agreed to allow officers to search his backpack before withdrawing his consent and denying their requests to search. The

fact that defendant then changed his mind and gave his consent does not mean that his later agreement was involuntary. Defendant not only agreed to allow officers to look inside his backpack but personally opened his backpack for officers to search. Based on these findings of fact, the trial court properly concluded that defendant's consent was voluntary under the totality of the circumstances.

Because we conclude that defendant voluntarily consented to the search of his backpack, we need not analyze whether officers had probable cause for the search, and we hold that discretionary review was improvidently allowed as to that issue. The trial court properly found that officers returned defendant's identification and that defendant voluntarily consented to the search of his backpack. We therefore reverse the decision of the Court of Appeals.

REVERSED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

Justice RIGGS did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

I respectfully dissent from the majority's conclusion that Mr. Wright voluntarily consented to the search of his backpack. The majority applies the wrong legal analysis and fails to examine all of the relevant facts. Under the totality of the circumstances, Mr. Wright's consent was the product of coercion rather than free will. Mr. Wright did not voluntarily consent to the search of his backpack. His eventual "yes" was not an "essentially free and unconstrained choice," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)), but rather a compelled response to relentless questioning and mounting psychological pressure.

The Fourth Amendment guards against unreasonable searches. A search is reasonable if supported by probable cause (and generally a warrant). *Id.* at 219. That standard requires a "fair probability" that officers will uncover evidence of a crime "in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause also turns on the "totality of the circumstances"—the whole picture, not isolated facts. *Id.* at 230–31.

If a person consents to a search, that consent excuses officers from having to obtain a warrant. *Schneckloth*, 412 U.S. at 219. But for consent to pass constitutional muster, it must be "freely and voluntarily given." *Id.* at 222 (cleaned up). This means that a defendant's permission must reflect an "essentially free and unconstrained choice." *Id.* at 225 (quoting *Culombe*, 367 U.S. at 602). Consent is invalid if the

defendant's will is "overborne" and their permission coerced through "explicit or implicit means, by implied threat or covert force." *Id.* at 225–26, 228.

Whether consent is voluntary depends on the "totality of all the surrounding circumstances." *Id.* at 226. Courts weigh the "characteristics of the accused," the "details of the interrogation," and the "psychological impact" of the officers' conduct in context. *Id.* This framework also accounts for the vulnerability of the individual. As *Schneckloth* makes clear, people in fragile or compromised situations may yield to even subtle coercion. The Fourth Amendment ensures that only true, voluntary consent can validate a warrantless search.

Ultimately voluntariness is a mixed question of law and fact. *See State v. Romano*, 369 N.C. 678, 691 (2017) ("Whether a consent to a search was in fact 'voluntary' is a question of fact to be determined from the totality of all the circumstances." (cleaned up)); *State v. Hardy*, 339 N.C. 207, 222 (1994) (addressing the voluntariness of a confession as a legal question). It asks not just what happened, but whether consent was freely given under the law of the Fourth Amendment. Trial courts resolve factual disputes—what officers said, how they acted, whether a defendant nodded or spoke. But whether those facts add up to voluntary consent under constitutional standards is a legal question for the courts.

Precedent confirms the distinction. In *Miller v. Fenton*, 474 U.S. 104 (1985), the Court held that the ultimate question of whether a confession was voluntary under the Fifth and Fourteenth Amendments required independent federal review as

a legal determination even where "subsidiary factual questions" are entitled to deference. *Id.* at 112. The Court reasoned that it is appropriate for the appellate court, as the expositor of the law, to give plenary review to the question of the voluntariness of a confession. "Where . . . the relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law." *Id.* at 114.

The same logic drove *Thompson v. Keohane*, 516 U.S. 99 (1995) (requiring de novo review of Miranda custody determinations), and *Ornelas v. United States*, 517 U.S. 690 (1996) (mandating independent review of probable cause and reasonable suspicion). Consent searches involve the same inquiry. The relevant question is whether an encounter became coercive—an inquiry that requires the application of legal principles. Appellate courts must respect trial courts' factual findings but independently determine whether those facts satisfy constitutional voluntariness.

This Court has followed a similar path. In *State v. Reed*, 373 N.C. 498 (2020), we reviewed whether a defendant consented to extend a traffic stop as a conclusion of law based on the trial court's findings. *Id.* at 514. Both the majority and dissent agreed that consent was a legal determination. *See id.* at 520–21 (Newby, J., dissenting). Even earlier cases that called voluntariness a "question of fact" did not reflexively defer to trial courts. *See Romano*, 369 N.C. at 691. In *State v. McDowell*,

329 N.C. 363 (1991), we scrutinized the trial court's findings before determining they supported the legal conclusion that the defendant's consent was voluntary. *Id.* at 377. And in the confession context, this Court has long recognized that whether police conduct overbore a defendant's will is a legal question subject to plenary appellate review. *See State v. Richardson*, 316 N.C. 594, 600–01 (1986). The same principle applies to consent searches.

Voluntariness turns not just on whether a defendant uttered "yes," but whether that "yes" was freely given, not merely the result of submission to authority. *Florida v. Royer*, 460 U.S. 491, 497 (1983). If a defendant, like Mr. Wright, verbally agrees to a search, that is a factual finding. But whether that agreement was voluntary under constitutional principles is a question of law. That is a constitutional judgment, and it is one this Court must decide.

Under the totality of the circumstances test established in *Schneckloth*, courts must examine three critical factors: "the characteristics of the accused," "the details of the interrogation," and "the psychological impact" of the officers' conduct. *Id.* at 226. When properly applied to the facts of this case, these factors compel the conclusion that Mr. Wright's purported consent was the product of coercion, not free will.

The first factor requires examination of Mr. Wright's personal circumstances and vulnerability at the time of the encounter. *See id.* at 226. This analysis recognizes

that individuals in "possibly vulnerable subjective state[s]" may yield to even subtle forms of coercion. *Id.* at 229.

Mr. Wright was an individual particularly susceptible to police pressure. He was homeless, walking alone on a cold night, lacking the security and stability that might otherwise permit resistance to unwanted police intrusion. His homelessness is not merely descriptive—it is legally significant. Those without housing face constant police scrutiny and understand that even polite noncompliance can escalate to arrest or worse consequences. *See id.* (recognizing that psychological vulnerability affects voluntariness).

Moreover, Mr. Wright explicitly expressed his fear, telling officers twice, "I'm scared." Rather than acknowledging this distress or taking steps to alleviate it, the officers dismissed his concerns. Officer Slaughter responded dismissively: "Whatchu scared about?" Officer Martin added: "You don't have to be scared." These responses ignored rather than addressed the very vulnerability that *Schneckloth* requires courts to consider.

Additionally, Mr. Wright's fear was neither irrational nor legally irrelevant. As an African American man confronting multiple armed officers at night, his apprehension reflected documented realities of police encounters. *United States v. Mendenhall,* 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) (citing as consent factors the "threatening presence of several officers" and "display of a weapon").

The second factor examines the specific circumstances and conduct of the police encounter. *See Schneckloth*, 412 U.S. at 229. Here, the details reveal a systematic escalation of demands designed to wear down Mr. Wright's resistance.

The officers employed a pattern of mounting demands: they ordered Mr. Wright to stop, confiscated his identification, directed him to dismount his bicycle and remove his backpack, conducted a frisk, and then persistently demanded access to his backpack. Each compliance led to another demand, creating an atmosphere where cooperation bred further intrusion rather than concluding the encounter.

Critically, the officers engaged in repeated, insistent requests after Mr. Wright's clear refusals. In barely one minute, Officer Martin asked five times to search the bag while Officer Slaughter added several additional requests. Courts have consistently recognized that such persistence weighs against voluntariness. *See United States v. Raibley*, 243 F.3d 1069, 1075–76 (7th Cir. 2001); *State v. Garcia*, 827 P.2d 727, 731 (Kan. 1992). When "no" repeatedly meets renewed requests, the interaction shifts from asking to demanding.

The officers also failed to inform Mr. Wright of his right to refuse consent. When Mr. Wright asked whether he had a choice, Officer Martin evasively responded, "I'm asking you." This failure to clearly advise of rights constitutes a significant factor against voluntariness under *Schneckloth*. *See Schneckloth*, 412 U.S. at 226.

Most tellingly, Officer Slaughter presented a false choice: "Can you open your bag for me so I don't have to look inside it?" This phrasing conveyed that the search

would occur regardless of Mr. Wright's preference—the only question was whether he would facilitate it. Such language transforms apparent consent into compelled submission.

The third factor requires assessment of how the officers' behavior would psychologically impact the individual under scrutiny. The totality of the officers' conduct created an atmosphere of coercion that overwhelmed Mr. Wright's capacity for free choice.

The environmental context amplifies psychological pressure. The encounter occurred on a dark, cold, isolated street where Mr. Wright stood alone facing three armed officers who surrounded him—one on each side and another in the squad car, effectively blocking his path. Officer Krause retained Mr. Wright's identification, a form of control that courts have recognized as indicative of seizure rather than consensual encounter. *Royer*, 460 U.S. at 504. The body-worn camera footage establishes the following sequence: At the start of the encounter, Mr. Wright handed his identification to Officer Krause, who took it back to the police vehicle. Officer Krause did not return until after the officers had searched Mr. Wright's backpack, found the gun, and placed him in handcuffs. Even then, Officer Krause was still holding Mr. Wright's identification while questioning him about his criminal history.

The trial court did not say Officer Martin returned Mr. Wright's ID—it said he "appeared" to do so. A factual finding must "reflect a conscious choice between the conflicting versions of the incident in question which emerged from all the evidence

presented." *In re Green*, 67 N.C. App. 501, 505 n.1 (1984). There is a critical difference between saying something appeared to happen and saying it happened. *See In re D.T.H.*, 378 N.C. 576, 585–86 (2021) (disregarding a trial court's finding that failed to resolve a material conflict).

Officer Slaughter's hand position on his weapon throughout much of the encounter, while subtle, reinforced the power dynamic. A weapon need not be drawn to convey its implicit threat. *See Michigan v. Chesternut,* 486 U.S. 567, 575 (1988*)*; *United States v. Mendenhall,* 446 U.S. 544, 554 (1980) *(*Stewart, J., concurring*)* (noting the effect of a "threatening presence" and "display of a weapon").

 The mere presence of accessible weapons underscores official authority and signals potential consequences for resistance.

The officers' dismissive treatment of Mr. Wright's expressed fear compounded the psychological pressure. By refusing to acknowledge his legitimate concerns, they demonstrated indifference to his emotional state and signaled that his consent was expected rather than requested. This approach is antithetical to the voluntary consent required by the Fourth Amendment.

The majority's focus on the officers' calm demeanor and conversational tone misses the constitutional forest for the procedural trees. Coercion need not involve shouted commands or drawn weapons to be constitutionally impermissible. *See Schneckloth*, 412 U.S. at 229. Subtle pressure applied to vulnerable individuals can be equally effective—and equally invalid.

Mr. Wright's ultimate capitulation after repeated refusals was not a change of mind but an act of surrender. His "consent" was the product of relentless pressure applied to a frightened, homeless man who had no realistic means of escape. The circumstances—his vulnerability, the officers' persistent demands despite his refusals, and the psychologically coercive atmosphere—demonstrate that his submission was compelled, not voluntary.

When the State seeks to justify a warrantless search based on consent, it bears the burden of proving that consent was "freely and voluntarily given." *Schneckloth*, 412 U.S. at 222. The State has failed to meet that burden. Mr. Wright's consent was neither free nor voluntary but rather the predictable result of official coercion applied to an individual lacking meaningful alternatives.

For these reasons, I would suppress the evidence obtained from the search of Mr. Wright's backpack because that evidence was obtained in violation of Mr. Wright's Fourth Amendment right to be free from unreasonable searches.

Justice DIETZ joins in this dissenting opinion.